**George Toby CASAREZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 1114–93.

Court of Criminal Appeals of Texas, En Banc.

Dec. 14, 1994.

Opinion Granting Rehearing
Dec. 13, 1995.

William S. Harris, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and David M. Curl, Asst. Dist. Atty., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

*OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

BAIRD, Judge.

Appellant was convicted of aggravated sexual assault and sentenced to twelve years confinement. Tex.Penal Code Ann. §§ 22.011 and 22.021. The Court of Appeals affirmed. *Casarez v. State*, 857 S.W.2d 779 (Tex.App.—Fort Worth 1993). We granted appellant's petition for discretionary review to determine whether the Equal Protection Clause of the Fourteenth Amendment prohibits the use of a peremptory challenge on the basis of religion.[1] U.S. Const., amend. XIV. We will reverse.

## I.

### THE INSTANT CASE

The State peremptorily challenged two black veniremembers. Appellant objected, contending the peremptory challenges were racially discriminatory and prohibited by Tex.Code Crim.Proc.Ann. art. 35.261 and *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor contended the veniremembers were not struck on the basis of race, but on the basis of their Pentecostal religion.[2] Appellant again objected, this time contending the use of a peremptory challenge on the basis of religion violates the Equal Protection Clause of the Fourteenth Amendment. The trial judge overruled the objection.

On appeal, appellant argued *Batson*'s application of the Equal Protection Clause

should be expanded to include religion. The majority opinion of the Court of Appeals read appellant's point of error as being limited to whether religion was of itself an impermissible reason for exercising peremptory strikes. *Casarez*, 857 S.W.2d at 783. The majority reasoned the Supreme Court's limited application of the Equal Protection Clause to race-based peremptory challenges indicated an intent to confine *Batson* to race and overruled the point of error. *Casarez*, 857 S.W.2d at 783–784.[3]

## II.

### EQUAL PROTECTION AND JURY SELECTION

The Supreme Court first applied the Equal Protection Clause to the jury selection process in *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). Strauder, a black man, was convicted by an all-white jury under a West Virginia statute which prohibited blacks from serving on grand or petit juries. *Id.*, 100 U.S. at 304, 25 L.Ed. 664. Strauder contended the statute violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* The Supreme Court agreed and held the statute unconstitutional:

> ... The very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by

---

1. Appellant's ground for review states:

   The Court of Appeals erred in ruling that the peremptory exclusion of potential jurors on the basis of their religion did not violate the principles of the Equal Protection Clause of the XIV Amendment to the United States Constitution in such a manner that required relief under the doctrine announced by the United States Supreme Court in *Batson v. Kentucky*.

2. The State offered other nonracial and nonreligious reasons for striking the veniremembers. *Casarez*, 857 S.W.2d at 782.

3. The majority opinion was limited to whether peremptory challenges on the basis on religion are permissible. Understandably, the majority did *not* address the State's alternative argument that the peremptory challenges were permissible for the nonreligious reasons offered by the State.

*See*, n. 2, *supra*. The majority's holding that the Equal Protection Clause did not prohibit the use of peremptory challenges on the basis of religion rendered the State's alternative argument moot. Because the majority opinion is limited, and because that limited holding is the sole basis of the appellant's ground for review, *see*, n. 1, *supra*, the State's alternative argument is not before us.

We pause to note the alternative argument was addressed in a separate concurring opinion which also noted one of the veniremembers was the thirty-third member of the venire. According to the concurrence, no explanation was required because the thirty-third veniremember was not deprived of the privilege of jury service because the jury was obtained from the first thirty-two veniremembers. *Casarez*, 857 S.W.2d at 788–89 (Hopkins and Lattimore, JJ., concurring).

the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others ... [T]he statute of West Virginia, discriminating in the selection of jurors ... amounts to a denial of equal protection of the laws to a colored man when he is put upon trial for an alleged offense against the State.

*Id.*, 100 U.S. at 308, 310, 25 L.Ed. 664. Importantly, *Strauder* restricted the application of the Equal Protection Clause to racially discriminatory practices affecting the composition of the venire. *Id.*, 100 U.S. at 312.

### A.

Almost a century later, the Supreme Court expanded the application of the Equal Protection Clause to peremptory challenges. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The Court held the Equal Protection Clause prohibits the racially discriminatory use of peremptory challenges but required criminal defendants to show the "systematic use" of such peremptory challenges over a period of time. *Id.*, 380 U.S. at 227, 85 S.Ct. at 839. Under the "systematic use" burden a defendant was required to compile evidence from multiple trials demonstrating a racially discriminatory pattern. *Id.*, 380 U.S. at 225–27, 85 S.Ct. at 838–839.

### B.

Twenty years later the Supreme Court discarded the "systematic use" requirement in the landmark case of *Batson v. Kentucky*, 476 U.S. 79, 95, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986). In *Batson*, the State used its peremptory challenges to exclude every black from the jury. *Id.*, 476 U.S. at 82–83, 106 S.Ct. at 1715. Recognizing a defendant was rarely entitled to relief under the crippling burden of *Swain*, the Court held the Equal Protection Clause prohibited the use of racially discriminatory peremptory challenges in an individual trial. *Id.*, 476 U.S. at 92–95, 106 S.Ct. at 1721–22. Thus, criminal defendants were allowed to enforce

the Equal Protection Clause's prohibition of racial discrimination whenever the State exercised peremptory challenges in a racially discriminatory manner.

Accordingly ... *the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause.* Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, *the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race* or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.[4]

*Id.*, 476 U.S. at 89, 106 S.Ct. at 1719 (footnotes and citations omitted).

### C.

Since *Batson*, the Supreme Court has expanded the scope and application of the Equal Protection Clause to the use of peremptory challenges. In *Powers v. Ohio*, 499 U.S. 400, 401–03, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411 (1991), the Court considered whether *Batson* required the excluded veniremembers to be of the same race as the defendant. Because the Equal Protection Clause prohibits racially discriminatory classifications, the defendant's race was irrelevant.

The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system ... The statutory prohibition on discrimination in the selection of jurors ... makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution....

... Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype ... But to say that the race of the defen-

4. All emphasis is supplied unless otherwise indicated.

dant may be relevant to discerning bias in some cases does not mean it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.

*Id.*, 499 U.S. at 415–16, 111 S.Ct. at 1373–74.

In *Edmonson v. Leesville Concrete, Co.*, the Supreme Court extended *Batson's* application of the Equal Protection Clause to civil trials. *Edmonson v. Leesville Concrete, Co.*, 500 U.S. 614, 629–33, 111 S.Ct. 2077, 2088–2089, 114 L.Ed.2d 660 (1991). However, in order for the Equal Protection Clause to apply, civil litigants had to be classified as state actors. *Id.*, 500 U.S. at 618–20, 111 S.Ct. at 2082. The Court determined civil litigants were state actors because the litigants "make extensive use of state procedures with the 'overt, significant assistance of state officials.'" *Id.*, 500 U.S. at 622, 111 S.Ct. at 2083–84.

Further, the Court held civil litigants have third-party standing to challenge the peremptory challenges of another party because the potential juror is unable to defend his or her participatory right and the integrity of the verdict is cast into doubt. Focusing on the harm caused by racial discrimination the Court stated:

> Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. *Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality* ... If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race *stereotypes* retards that progress and causes continued hurt and injury.

*Id.*, 500 U.S. at 628–31, 111 S.Ct. at 2087–2088.

In *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court considered whether the Equal Protection Clause applied to the peremptory challenges of criminal defendants. The Court held criminal defendants, like civil litigants, constructively effect state action during voir dire because they wield the power to choose the jury, "the institution of government on which our judicial system depends."

*Id.*, 505 U.S. at 54, 112 S.Ct. at 2356. The Court then turned to the question of whether a criminal defendant's Sixth Amendment right to a fair trial and the criminal defendant's use of peremptory challenges defeated the State's third-party standing to raise a *Batson* issue. *McCollum*, 505 U.S. at 54–59, 112 S.Ct. at 2357–2359. In holding criminal defendants may not use peremptory challenges in a racially discriminatory manner, the Court focused on the "harm done to the dignity of persons and the integrity of the courts:"

> We do not believe that this decision will undermine the contribution of the peremptory challenge to the administration of justice. Nonetheless, if race *stereotypes* are the price for acceptance of a jury panel as fair, we reaffirm today that such a price is too high to meet the standard of the Constitution ... The goal of the Sixth Amendment is jury impartiality with respect to both contestants.

*Id.*, 505 U.S. at 58, 112 S.Ct. at 2358 (citations and internal quotations omitted).

## III.

### AN ANALYTICAL FRAMEWORK

The Supreme Court's application of the Equal Protection Clause to peremptory challenges did not end with race. The Court next considered whether the Equal Protection Clause prohibited the use of peremptory challenges to exclude veniremembers on the basis of gender. *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). In *J.E.B.* the Court developed an analytical framework to apply the Equal Protection Clause to the discriminatory use of peremptory challenges. To understand this analytical framework, we must first consider the traditional Equal Protection review of discriminatory classifications.

### A.

The underlying tenet of the Equal Protection Clause is that the Government must treat citizens as individuals, not simply as components of a racial, religious, sexual, or

national class.[5] Accordingly, the Equal Protection Clause generally prohibits the government from using suspect classifications as a basis for discriminating between individuals.[6] A violation of the Equal Protection Clause may occur when the government discriminates against the members of a class of individuals who have historically suffered discrimination, i.e., a "suspect" class, or when the government impairs the members of a class from exercising a fundamental right.[7]

To determine the constitutionality of discrimination between classes of individuals, the Supreme Court has historically employed two standards of review: (1) strict scrutiny review; and, (2) rational relationship review. *Wygant v. Jackson Board of Education,* 476 U.S. 267, 279–80, 106 S.Ct. 1842, 1849–50, 90 L.Ed.2d 260 (1986). To satisfy strict scrutiny review, the discriminatory classification must promote a compelling government interest and be narrowly tailored to achieve that interest. *Metro Broadcasting,* 497 U.S. at 602, 110 S.Ct. at 3029 (O'Connor, J., dissenting); *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–97, 109 S.Ct. 706, 721–23, 102 L.Ed.2d 854 (1989). Stated another way, to survive strict scrutiny, the government must prove the classification is based upon an essential government objective which is achieved by the least intrusive means. *Id.* Strict scrutiny review has been employed with discriminatory classifications based upon race, national origin and alienage, or when a discriminatory classification burdens or impairs the ability of a class to exercise a fundamental right.

On the other hand, under a rational relationship review the Court presumes the discriminatory classification is valid. *Schweiker v. Wilson,* 450 U.S. 221, 234, 101 S.Ct. 1074, 1082–1083, 67 L.Ed.2d 186 (1981). A discriminatory classification will be upheld so long as it bears a rational relationship to any legitimate governmental interest. *Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1 (1988). Historically, the Supreme Court has employed a rational relationship review with general economic or social welfare legislation. *Id.* Currently, the Supreme Court employs a rational relationship review whenever the discriminatory classification does not involve a fundamental right, suspect class or alienage, gender or legitimacy. Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.3 (2d ed. 1992).

During the last twenty-five years the Supreme Court has developed a third standard of review, known as intermediate scrutiny. In order to prevail under an intermediate scrutiny review, the government must demonstrate the discriminatory classification is substantially related to an important governmental interest. *See, Hogan,* 458 U.S. at

---

**5.** *See, Wygant v. Jackson Board of Education,* 476 U.S. 267, 279–80, 106 S.Ct. 1842, 1849–50, 90 L.Ed.2d 260 (1986) (applying equal protection scrutiny to racial classification); *Anderson v. Celebrezze,* 460 U.S. 780, 794, n. 16, 103 S.Ct. 1564, 1572, n. 16, 75 L.Ed.2d 547 (1983) (discussing application of heightened equal protection scrutiny to groups-affiliations based on the exercise of First Amendment rights); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724–26, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982) (testing gender-based classifications under equal protection scrutiny); *Plyler v. Doe,* 457 U.S. 202, 216–17, 217, n. 15, 102 S.Ct. 2382, 2394–95, 2395, n. 15, 72 L.Ed.2d 786 (1982) (plurality decision) (deriving constitutionally suspect classifications from both historically oppressed classifications and group-affiliations which relate to First Amendment Rights such as religious exercise); *and, United States v. Carolene Products,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 783–784, n. 4, 82 L.Ed. 1234 (1938) (defining equal protection as applicable to "discrete and insular minorities" which relate to certain fundamental rights). *See also, J.E.B. v. Alabama ex rel. T.B.,* — U.S. ——, ——, 114 S.Ct. 1419, 1434, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring); *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 602, 110 S.Ct. 2997, 3028, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting and joined by Rhenquist, Scalia, and Kennedy) (listing religious classifications as groups subject to equal protection's prohibition on stereotyping); *and, Arizona Governing Committee v. Norris,* 463 U.S. 1073, 1083, 103 S.Ct. 3492, 3498, 77 L.Ed.2d 1236 (1983) (including religious groups with other heightened scrutiny classifications under Title VII).

**6.** *See,* n. 3, *supra; and,* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.2, at 7 (2d ed. 1992).

**7.** *See,* n. 3, *supra; and,* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.3 (2d ed. 1992).

724, 102 S.Ct. at 3336–37; *and, Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). An intermediate scrutiny review is employed to review classifications based upon gender or illegitimacy.

Therefore, all discriminatory classifications must, at the very least, be rationally related to a legitimate governmental interest. *Id.* Moreover, discriminatory classifications which infringe on the exercise of a fundamental right, or which affect a suspect class, must satisfy the more stringent intermediate scrutiny or strict scrutiny review. Discriminatory classifications which are subject to strict scrutiny review or intermediate scrutiny review are said to be subject to a *"heightened equal protection scrutiny." J.E.B.,* ── U.S. at ──, 114 S.Ct. at 1424; *and,* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.3, at 14–28 (2d ed. 1992).

### B.

In *J.E.B.*, the Supreme Court held the Equal Protection Clause prohibited the use of peremptory challenges to exclude veniremembers on the basis of gender. Six justices held the same harm caused by racial discrimination in the jury selection process occurs with equal force to gender discrimination:

> Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system. It not only furthers the goals of the jury system. It reaffirms the promise of equality under the law—that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy ... When persons are excluded from participating in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized.

*Id.,* ── U.S. at ──, 114 S.Ct. at 1430 (footnotes and citations omitted).[8] Consequently, the Equal Protection Clause guarantees each person who is "granted the opportunity to serve on a jury ... the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination." *Id.,* ── U.S. at ──, 114 S.Ct. at 1428.

For the first time the Supreme Court unequivocally attached *Batson*'s application of the Equal Protection Clause to those discriminatory classifications subject to "heightened equal protection scrutiny."[9] *Id.,* ── U.S. at ──, 114 S.Ct. at 1425. Because discriminatory classifications based upon gender are subject to heightened equal protection scrutiny, *Mississippi University for Women v. Hogan*, 458 U.S. 718, 724–26, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982) (applying intermediate scrutiny review to gender-based discriminations), the Court considered:

> ... whether discrimination on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial trial ... [Or more precisely] whether peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury.

> I agree with the Court that the Equal Protection Clause prohibits the government from excluding a person from jury service on account of their gender. The State's proffered justification for its gender-based peremptory challenges are far from the 'exceedingly persuasive' showing required to sustain a gender-based classification.

*J.E.B.,* ── U.S. at ── ──, 114 S.Ct. at 1430–1431 (O'Connor, J., concurring) (citations omitted). Despite her agreement with the heightened scrutiny rationale, Justice O'Connor wrote separately to reiterate her opinion that *Batson* protection should be limited to the State's use of peremptory challenges in criminal trials. *Id. See,* n. 8, *supra.*

---

**8.** Justice Blackmun wrote the four-justice plurality opinion extending *Batson* protection to gender-based peremptory challenges. *J.E.B.,* ── U.S. at ── ──, 114 S.Ct. at 1429–30 (plurality opinion). Justice O'Connor concurred in the judgment and fully adopted the majority's rationale as it applied to criminal defendants. *Id.* ── U.S. at ── ──, 114 S.Ct. at 1430–33 (O'Connor, J., concurring). Justice Kennedy concurred only in the result, but adopted a rationale very similar to the majority. *Id.* ── U.S. at ── ──, 114 S.Ct. at 1433–34 (Kennedy, J., concurring).

**9.** Justice O'Connor adopted the plurality's rationale:

*J.E.B.,* —— U.S. at ——–——, 114 S.Ct. at 1425–1426 (footnotes omitted). Because gender alone is not an accurate predictor of juror attitudes, the Court held *peremptory* challenges based upon gender failed to pass the heightened equal protection scrutiny analysis. The Court concluded, "[w]e shall not accept as a defense to gender-based peremptory challenges the very stereotype the law condemns." *Id.,* —— U.S. at ——, 114 S.Ct. at 1426 (internal quotations omitted).

As with the *Batson* line of cases, the *J.E.B.* Court continued to focus on the harm caused by the discriminatory use of peremptory challenges.

Discrimination in jury selection ... causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice which motivated the discriminatory selection of the jury will infect the entire proceedings ... The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1427 (citations omitted).

Under the analytical framework of *J.E.B.,* the Equal Protection Clause prohibits the discriminatory use of peremptory challenges based on a classification which qualifies for, but fails to pass, "heightened equal protection scrutiny." *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1425.[10]

## IV.

## RELIGIOUS DISCRIMINATION

Today, we are asked to determine whether the Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges on the basis of religion.[11] To resolve this issue, we must first determine whether discriminatory classifications based

---

10. Judges McCormick and Meyers, while conceding that our application of *J.E.B.*'s analytical framework is correct, dissenting op., pg. 483 (McCormick, P.J., dissenting); dissenting op. pg. 494 (Meyers, J., dissenting), are "not persuaded that the United States Constitution forbids peremptory removal of prospective jurors on account of their religion." Dissenting op. pg. 490 (Meyers, J., dissenting). Neither Judge McCormick nor Judge Meyers dispute that *J.E.B.* attached *Batson*'s constitutional protection to classifications which warrant heightened equal protection scrutiny. *See, J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1425. Further, Judges McCormick and Meyers do not, and indeed cannot, contend that religious classifications are not subject to heightened equal protection scrutiny. Instead, each Judge ignores *J.E.B.* and expresses his personal view of *Batson.* Judge McCormick urges "that the social experiment started in *Batson* be aborted ..." Dissenting op., pg. 484. Judge Meyers believes *Batson* should be limited to race and gender. However, even if we accepted the view of either Judge, it is clear the Supreme Court does not. The Supreme Court is the final arbiter of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. As judges on this honorable Court, we are bound to apply the United States Constitution as interpreted by the Supreme Court; we do not have the luxury or the liberty to ignore binding precedent.

11. The Minnesota Supreme Court rejected an attempt to extend the Equal Protection Clause to peremptory challenges based on religion. *State v. Davis,* 504 N.W.2d 767, 771–72 (Minn.1993). Notably, *Davis* was decided prior to *J.E.B.* when the Supreme Court had seemingly limited *Batson* to race. *Id.* However, *J.E.B.* undermined the Minnesota Court's rationale.

Despite the Minnesota Court's faulty belief that *Batson* was limited to race, the United States Supreme Court denied certiorari. *Davis v. Minnesota,* —— U.S. ——, ——, 114 S.Ct. 2120, 2120–22, 128 L.Ed.2d 679 (1994). Although the denial of a writ of certiorari imports no expression of opinion upon the merits of the case, and opinions accompanying the denial of certiorari do not have the same effect as decisions on the merits, *Teague v. Lane,* 489 U.S. 288, 296, 109 S.Ct. 1060, 1067–1068, 103 L.Ed.2d 334 (1989), it should be noted that Justices Scalia and Thomas dissented to the denial of certiorari, arguing: (1) the Minnesota Court's holding should be vacated because it was based on the traditional restriction of *Batson* to racial discrimination; and, (2) *J.E.B.*'s reliance on "heightened equal protection scrutiny" opened the door to a broader application of equal protection than race and gender discrimination. *Davis,* —— U.S. at ——, 114 S.Ct. at 2121–2122.

Several other jurisdictions have extended *Batson* protection to ethnicity and religion. *See, State v. Alen,* 616 So.2d 452 (Fla.1993); *People v. Snow,* 44 Cal.3d 216, 242 Cal.Rptr. 477, 746 P.2d 452 (1987); *and, State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150, 1159 n. 3. (1986).

upon religion are subject to heightened equal protection scrutiny.

### A.

Our democratic government arose from a period of severe religious discrimination. England suppressed all religious affiliations other than those with the Anglican Church. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv.L.Rev. 1410, 1421 (1990). Other religious groups were forbidden to practice their beliefs, imprisoned for practicing their beliefs, and barred from holding public office. *Id.; and,* The Test Act of 1672, 25 Car. 2, ch. 2 (restricting public and military office to Anglican church members). Therefore, many religious groups sought religious tolerance in the American colonies. *The Origins and Historical Understanding of Free Exercise of Religion, supra,* at 1422. However, religious discrimination flourished on this continent as well. The Puritans statutorily banished Baptists from the New England territories, and jailed or expelled other religious dissenters. *Id.* The Virginia Anglican Church horsewhipped, jailed and prevented other religious groups from preaching. *Id.,* at 1423. Further, New York and New Jersey attempted to enforce Anglican intolerance, failing only because of their diverse religious constituencies. *Id.,* at 1424.

The Carolinas, Delaware, Maryland, Pennsylvania, and Rhode Island responded to religious discrimination by adopting a policy of religious toleration which guaranteed the "freedom of conscience." *Id.,* at 1424–1425; *and,* R.I. Charter of 1663, *reprinted in* 2 Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the United States 1595–96 (B. Poore 2d ed. 1878). These religious toleration policies are viewed as the predecessors to today's constitutional provisions regarding religion. *The Origins and Historical Understanding of Free Exercise of Religion, supra,* at 1424–1425. The framers of the United States Constitution incorporated substantial religious protections into art. VI and the First Amendment of the United States Constitution to prevent religious discrimination.[12] *Id.,* at 1515–16; U.S. Const. art. VI; U.S. Const., amend. I. Art. VI and the First Amendment have prohibited discriminatory classifications based upon an individual's religion since 1791, some seventy-five years prior to the adoption of the Fourteenth Amendment and its Equal Protection Clause. *Compare,* U.S. Const., amend. I *with,* U.S. Const., amend. XIV (ratified 1868).

Almost seventy years ago we recognized the Equal Protection Clause prohibited discriminatory classifications based upon religion. *Juarez v. State,* 102 Tex.Crim. 297, 277 S.W. 1091 (Tex.Cr.App.1925). Juarez moved to quash his indictment because Catholics were prevented from serving as grand jurors because of their religious belief. The trial judge overruled Juarez's motion and we reversed.

In bringing about a violation of the provisions of the Fourteenth Amendment, the

---

**12.** Article VI forbids the use of "religious tests" to exclude citizens from "public trusts." U.S. Const. art. VI, cl. 3. The discriminatory classification of individuals based upon their religious belief is such a religious test. The peremptory challenge, however, allows religion to be used as a "test" for juror competence. *Swain,* 380 U.S. at 220, 85 S.Ct. at 836 (positing that religion is a routine basis for removing veniremembers on arbitrary grounds). *See, State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150, 1167–1168 (1986) (Peremptory challenges exercised against Blacks based on the assumption that they were predominantly Baptists was a clear indication of group bias, both racial and religious.)

Further, the Supreme Court has classified jury duty as a public trust of the highest order.

... [The jury is] an entity that is a quintessential governmental body, having no attributes of a private actor. The jury exercises the power of the court and of the government that confers the court's jurisdiction ... [T]he jury system performs the critical governmental functions of guarding the rights of litigants and insuring the continued acceptance of the laws by all of the people.

*Edmonson,* 500 U.S. at 624, 111 S.Ct. at 2085 (citations and internal quotations omitted). Indeed, it is difficult to imagine a more sacred public trust than the proper adjudication of a criminal case.

The First Amendment provides that Congress shall make no law prohibiting the free exercise of religion. U.S. Const., amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

state cannot do indirectly through its officers or agents that which it could not do directly by legislative act. If the Legislature of the state should pass a law saying that hereafter no man holding to the Baptist religious faith, or the Methodist religious faith, should ever be permitted to serve on a grand jury in this state, and a party adhering to the religious faith so designated should claim that by such legislative act his rights under the Fourteenth Amendment had been violated, the validity of such a law could never be sustained. *Juarez*, 277 S.W. at 1094.

## B.

In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court considered the constitutionality of a South Carolina statute which allowed the State Unemployment Commission to deny benefits to Seven–Day–Adventists because of their religious prohibition of Saturday work. *Id.*, 374 U.S. at 399–402, 83 S.Ct. at 1791–93. The Court held the freedom to hold or practice religious beliefs is a fundamental right subject to strict scrutiny review. *Id.*, 374 U.S. at 403, 83 S.Ct. at 1793–94. The Court held the statute unconstitutional because it burdened a group's free exercise of religion and was not justified by a "compelling government interest." *Id.*, 374 U.S. at 403–09, 83 S.Ct. at 1793–1796.

In *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the Supreme Court considered a Minnesota statute which required all religious groups who did not receive fifty per cent of their donations from members or affiliated organizations to file an extensive annual report. *Id.*, 456 U.S. at 231, 102 S.Ct. at 1676. Valente argued the statute violated the Equal Protection Clause. Using a strict scrutiny review, the Supreme Court held Minnesota "failed to demonstrate that the fifty per cent rule ... is 'closely fitted' to further a 'compelling governmental interest.'" *Id.*, 456 U.S. at 251, 102 S.Ct. at 1687.

Strict scrutiny review remains the uncontested standard for evaluating government infringements on religious freedom. In *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Supreme Court considered the constitutionality of five municipal ordinances which prohibited animal cruelty, ritualistic sacrifice of animals, and the slaughter of animals outside of areas zoned for slaughterhouses. *Id.*, 508 U.S. at ——, 113 S.Ct. at 2223–2224. The municipal ordinances were passed shortly after Lukumi Babalu Aye, Inc., a Santeria Church, leased property within the city and announced plans to establish a house of worship. *Id.*, 508 U.S. at ——, 113 S.Ct. at 2223. An integral part of the Santeria religion is the sacrifice of animals at "birth, marriage, and death rites, for the cure of the sick, for the initiation of new members and priests, and during an annual celebration." *Id.*, 508 U.S. at ——, 113 S.Ct. at 2222. The Santeria Church sought declaratory relief, contending the municipal ordinances violated the Free Exercise Clause in the First Amendment. *Id.*, 508 U.S. at ——, 113 S.Ct. at 2224. The Supreme Court held:

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests. The compelling interest standard that we apply ... really means what it says. *A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases.* It follows from what we have already said that these ordinances cannot withstand this scrutiny.

*Id.*, 508 U.S. at ——, 113 S.Ct. at 2233 (citations and quotations omitted).[13]

---

**13.** *See also, Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *McDaniel v. Paty*, 435 U.S. 618, 626–29, 98 S.Ct. 1322, 1327–29, 55 L.Ed.2d 593 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 215,

The right to the free exercise of religion is unquestionably a fundamental right and any

impairment of that right is subject to strict scrutiny review.[14] Consequently, we hold the

92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *and, Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971).

Further, the Religious Freedom Restoration Act of 1993, P.L. 103–141, 107 Stat. 1488–89 (RFRA) defined religious exercise as a fundamental right and applied strict scrutiny review to infringements on this right. Accordingly, RFRA expressly guaranteed a strict scrutiny review to any infringement of the right to religious freedom:

> The framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution ... [Therefore,] [g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability ... [unless] it demonstrates that application of the burden to the person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

*Id.* Thus, Congress has codified the Supreme Court's historical treatment of the right to religious freedom.

Finally, the Supreme Court applies strict scrutiny review to any violation of a fundamental right. *See, Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833, 863–902, 112 S.Ct. 2791, 2813–33, 120 L.Ed.2d 674 (1992) (applying strict equal protection scrutiny to a woman's fundamental liberty interest to terminate pregnancy); *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 384–85 n. 4, 112 S.Ct. 2538, 2543–44 n. 4, 120 L.Ed.2d 305 (noting the need in constitutional jurisprudence to "fuse" the First Amendment with the Equal Protection Clause); *Burson v. Freeman*, 504 U.S. 191, 197 n. 3, 112 S.Ct. 1846, 1850–1851, n. 3, 119 L.Ed.2d 5 (1992) (plurality opinion) (observing interchangeability of the Equal Protection Clause and First Amendment rationales in applying strict scrutiny review); *Austin v. Michigan State Chamber of Comm.*, 494 U.S. 652, 666–67, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990) (holding that strict scrutiny review necessary to analyze an abridgement of the First Amendment right to political expression); *Lyng v. International Union, UAW*, 485 U.S. 360, 365, 108 S.Ct. 1184, 1189, 99 L.Ed.2d 380 (1988) (recognizing that heightened equal protection scrutiny would attach to any infringement of the First Amendment Right to Association); *Carey v. Brown*, 447 U.S. 455, 459–463, 100 S.Ct. 2286, 2289–91, 65 L.Ed.2d 263 (1980) (strict scrutiny review applies to First Amendment "free speech" violations); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1975) (strict scrutiny review applies to violations of a fundamental right); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973) (strict scrutiny

review applies to violations of a fundamental right); *Bullock v. Carter*, 405 U.S. 134, 142–45, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972) (strict scrutiny review applies to abridgment of fundamental right to vote); *Shapiro v. Thompson*, 394 U.S. 618, 629–31, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969) (strict scrutiny review applies to abridgement of fundamental right to travel); *Williams v. Rhodes*, 393 U.S. 23, 31–32, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968) (strict scrutiny review applies to violations of First Amendment); *and,* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.3, at 15–19 (2d ed. 1992).

14. At times the rights guaranteed by the First Amendment become fused with those guaranteed by the Fourteenth Amendment. *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 385, 112 S.Ct. 2538, 2544, 120 L.Ed.2d 305 (1992) ("This Court itself has occasionally fused the First Amendment into the Equal Protection Clause ... but at least with the acknowledgment ... that the First Amendment underlies its analysis."). The most often cited example of the fusion of First Amendment rights into the Fourteenth Amendment is *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Mosely sought a declaratory judgment that Chicago's picketing ordinance was unconstitutional. The ordinance prohibited picketing within 150 feet of a school except peaceful picketing of any school involved in a labor dispute. The Supreme Court held the ordinance violated the Equal Protection Clause *and* the First Amendment, stating:

> ... the equal protection claim in this case is closely intertwined with First Amendment interests; the Chicago ordinance affects picketing, which is expressive conduct; moreover, it does so by classifications formulated in terms of the subject of picketing.

*Id.*, 408 U.S. at 95, 92 S.Ct. at 2290. *See also, Niemotko v. Maryland*, 340 U.S. 268, 272, 71 S.Ct. 325, 327–328, 95 L.Ed. 267 (1951) ("... [T]he right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body."). Additionally, in *Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Court stated:

> ... Although the challenge in that case was brought solely on equal protection grounds, and not under the First Amendment, the Court was obliged to decide whether the statutory classification should be reviewed under a stricter standard than mere rational-basis review because it ... burden[s] a fundamental right.

*Id.*, 485 U.S. at 366, 108 S.Ct. at 1189.

Equal Protection Clause of the Fourteenth Amendment prohibits the use of a peremptory challenge on the basis of religion absent a compelling governmental interest.[15]

## IV.

## COMPELLING GOVERNMENTAL INTEREST

### A.

Having found that discriminatory classifications based upon religion require heightened equal protection review, we must now decide whether the State has demonstrated a compelling governmental interest in the discriminatory use of a peremptory challenge on the basis of religion. The only interest asserted by the State in the instant case is "[t]he historical importance of peremptory strikes." State's Brief pg. 23. The State contends, and we agree, that peremptory challenges further our need for a "qualified and impartial jury," and enable the parties to ascertain and act upon the possibility of bias. States Brief pg. 26. And we agree that peremptory challenges facilitate the impaneling of an impartial and unbiased jury. State's Brief, pg. 27. However, as the Supreme Court noted in *J.E.B.*,

... In making this assessment, we do not weigh the value of peremptory challenges as an institution against our asserted commitment to eradicate invidious discrimination from the courtroom. Instead, we consider whether peremptory challenges based on [religious] stereotypes provide [essential] aid to a litigant's efforts to secure a fair and impartial jury.[16]

---

**15.** Judge Meyers states, "... the only significant matter that members of a religious faith genuinely have in common is their belief in certain principles, doctrines, or rules." Dissenting Op., pg. 491. This statement assumes that all members of a religious group subscribe to and accept the formal teachings of their religion. Consequently, Judge Meyers argues that stereotypes of religious groups are accurate and may be relied upon to determine the attitudes and beliefs of the individuals who belong to those groups. Therefore, Judge Meyers believes peremptory challenges based on religious stereotypes should be permissible. Dissenting Op., pp. 491–92. This argument is faulty for several reasons. First, it perpetuates the use of stereotypes. The Equal Protection Clause clearly prohibits the use of peremptory challenges on the basis of a stereotype attributed to a class subject to heightened equal protection scrutiny. *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1425. Such stereotyping retards our efforts to progress as a multicultural society. *Edmonson*, 500 U.S. at 629–31, 111 S.Ct. at 2088. Secondly, Judge Meyers ignores the axiom that jurors sit as individuals, not as representatives of a particular group. *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1434 (Kennedy, J., concurring). Thirdly, Judge Meyers' argument is fallacious. One cannot assume that every member of a certain religion believes the resolutions and views of their religious leaders. For example, although the Catholic Church condemns the use of artificial contraceptives, *see*, Bromley, *Catholics and Birth Control* 3–4 (1965); *and*, Maddox, *The Pope and Contraception*, 29 (1991), 84% of the members of the Catholic Church believe catholics should be allowed to use artificial contraceptives. Gallup, *The Gallup Poll: Public Opinion 1993* 145 (Wilmington, Del.: Scholarly Resources, 1994). In another context, we concluded that it would be irrational to conclude simply from membership that one is aware of all of the rules of an organization. *Urbano v. State*, 837 S.W.2d 114, 117 (Tex.Cr.App.1992).

Finally, Judge Meyers ignores the rationale and reasoning of *Batson* and *J.E.B.*. Peremptory challenges of members of a class subject to heightened equal protection scrutiny on the basis of their personal beliefs are *not* constitutionally prohibited so long as those beliefs are related to the particular case being tried. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. However, peremptory challenges exercised on the basis of a stereotype attributed to a class subject to heightened equal protection scrutiny are prohibited. We believe this is the true teaching of the Supreme Court; if the veniremember holds personal beliefs or attitudes that are unacceptable, that veniremember may be peremptorily challenged. However, the Equal Protection Clause prohibits peremptorily challenging a member of a class subject to heightened equal protection scrutiny based on stereotypical assumptions attributed to that class. Rather than make unfounded assumptions, the litigants should question the venire as to their beliefs. Such a properly conducted voir dire will inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular religion both unnecessary and unwise. *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1429. In the instant case, had the individual veniremembers been questioned about their beliefs and expressed a belief unacceptable to the State, when viewed in relation to the instant case, they could have peremptorily challenged. Under those circumstances the veniremembers would have been excused on the basis of their personal beliefs and not on a stereotypical assumption based on their religion.

**16.** *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1425. Although in *J.E.B.*, the Supreme Court conducted

*J.E.B.,* —— U.S. at —— ——, 114 S.Ct. at 1425–26 (footnotes omitted).

The State offers no other reason, much less a compelling reason, to justify the discriminatory classification of veniremembers on the basis of religion. As with race and gender, religious affiliation is not an accurate predictor of jurors' attitudes. As the Supreme Court stated:

> . . . In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of the skin, the accident of birth, or *the choice of religion.*

*McCollum,* 505 U.S. at 59, 112 S.Ct. at 2359 (emphasis added, quoting *Ristaino v. Ross,* 424 U.S. 589, 596, n. 8, 96 S.Ct. 1017, 1021, n. 8, 47 L.Ed.2d 258 (1976)). Consequently, we hold religion simply may not serve as a proxy for constitutionally prohibited bias. *See, J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1430.

**B.**

The Equal Protection Clause's prohibition of peremptory challenges based upon religion does not herald the end of peremptory challenges. As the *McCollum* Court eloquently stated:

> We do not believe that this decision will undermine the contribution of the peremptory challenge to the administration of justice. Nonetheless, "if . . . stereotypes are the price for acceptance of the jury panel as fair" we reaffirm today that such a "price is too high to meet the standard of the Constitution." . . . It is an affront to justice to argue that a fair trial includes the right to discriminate. . . .

*McCollum,* 505 U.S. at 57, 112 S.Ct. at 2358 (quoting *Edmonson,* 500 U.S. at 629–31, 111 S.Ct. at 2088).

Parties may still challenge veniremembers whom they feel are more prone to bias than other members of the jury panel. As the Supreme Court stated in *J.E.B.,* a properly conducted voir dire "can inform litigants about potential jurors, making reliance upon

an intermediate scrutiny review, a strict scrutiny

stereotypical and pejorative notions about a particular [religious group] unnecessary and unwise." *Id.,* —— U.S. at ——, 114 S.Ct. at 1429. However, the exclusion of such veniremembers must be based upon bias held by the individual veniremember, not a perceived bias which arises solely as a result of the veniremember's race, gender or religion. *See,* n. 15, *supra.*

**VI.**

**PRESERVATION OF CLAIM**

The Supreme Court has developed a procedure to present claims of violations of the Equal Protection Clause when peremptory challenges are exercised on the basis of race or gender. We believe this framework should be applied when peremptory challenges are allegedly used to discriminate on the basis of religion. To prove a violation of the Equal Protection Clause, a litigant must make a *prima facie* showing of discriminatory classifications based upon religion. *Batson,* 476 U.S. at 96–97, 106 S.Ct. at 1723. Once a *prima facie* case is made, the burden shifts to the opposing party to provide religion-neutral reasons for the peremptory challenge. *Id.* Such a justification need not rise to the level of a challenge for cause; rather it merely must be based on a juror characteristic other than religion, and the proffered explanation may not be pretextual. *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

**VII.**

**CONCLUSION**

As with any constitutionally prohibited stereotype, the use of religion as a basis for exercising a peremptory challenge harms both the excluded veniremember and the judicial system. If we were to allow religion-based peremptory challenges, the Equal Protection Clause's fundamental guarantee that the government will treat Americans as individuals rather than stereotypical components of a religious class would be meaningless. A juror sits not as a representative of a racial, religious, or sexual group but as an individual

review is appropriate in the instant case.

citizen. *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1434 (Kennedy, J., concurring). The individual citizen's opportunity to participate in the fair administration of justice is fundamental to our democratic system and reaffirms the promise of equality under the law. All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination. *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1428. When persons are excluded from participation in our democratic processes because of race, religion or gender the promise of equality dims, and the integrity of our judicial system is jeopardized. *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1430.

The judgment of the Court of Appeals is reversed and this case is remanded to that Court for further proceedings consistent with this opinion.[17]

CLINTON, J., joins the opinion of the Court, observing that this decision as well as others by the Supreme Court serve to render obsolete Tex.Code Crim.Proc.Ann. art. 35.261, so the Legislature would be well advised to revise the same.

MALONEY, J., concurs in the result.

McCORMICK, Presiding Judge, dissenting.

At the risk of being accused of attempting to retard "efforts to progress as a multicultural society," I dissent. The majority opinion represents yet another step backwards in the important business of insuring fair trials in criminal cases for what is perceived to be the "greater good" of making sure people do not exercise peremptory challenges based on improper thoughts.

So we do not completely lose our focus here, I briefly set out the facts of the case. The evidence shows the twenty-one-year-old appellant and his friend sexually assaulted a fourteen-year-old girl, who testified she never had had sexual intercourse prior to this incident. During the assault, appellant threatened the victim more than once, he punched her in the nose and appellant's friend cut off her shirt with a knife. Appellant and his friend did unspeakably horrible things to the child-victim.

Contrary to the majority's assertion, the voir dire record in this case actually reflects the prosecutor struck one of the veniremembers because she had "a brother currently in the Texas penitentiary, she was a postal clerk and she expressed discomfort with the law as it regards sexual assault of a child." *Casarez v. State,* 857 S.W.2d 779, 782 (Tex.App.—Fort Worth 1993). The prosecutor struck the other veniremember because his "brother had been arrested, he incorrectly completed his juror questionnaire, and the questioning during voir dire left the prosecutor with the impression that he was somewhat slow." *Id.* The prosecutor struck both veniremembers also because they were Pentecostals. *Id.* The prosecutor explained that based on his experience, Pentecostals often had difficulty assessing punishment. *Id.* On this record, the peremptory challenges were proper, and this Court does not need to decide whether *Batson* should be extended to "religious-based" peremptory challenges.[1] Cf. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Hill v. State,* 827 S.W.2d 860, 866–68 (Tex.Cr.App.) (plurality op.), *cert. denied,* 506 U.S. 905, 113 S.Ct. 297–98, 121 L.Ed.2d 221 (1992) (race properly may be a factor coexisting with a nonracial reason for a peremptory

---

**17.** To varying degrees, Judges McCormick, Campbell and White believe the instant case is controlled by *Hill v. State,* 827 S.W.2d 860 (Tex. Cr.App.1992). However, that issue is not before us. For the reasons stated in n. 3, *supra,* this opinion is limited to the Court of Appeals' holding that the Equal Protection Clause does not prohibit the use of peremptory challenges on the basis of religion. Upon remand, the Court of Appeals is free to consider to what extent, if any, our plurality opinion in *Hill* applies.

**1.** But, we expend more than 50 pages discussing whether these facts violate the Equal Protection Clause of the Fourteenth Amendment, and, more specifically, whether the peremptory challenges were based on a constitutionally improper stereotype about the veniremembers' Pentecostal faith!

strike); *Casarez*, 857 S.W.2d at 788–89 (Hopkins, J., concurring).

I also dissent to the majority's apparent holding that religious-based peremptory challenges are subject to strict scrutiny review under the Equal Protection Clause of the Fourteenth Amendment. The applicable rule is that "unless a classification warrants some form of heightened review because it jeopardizes [the] exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2332–33, 120 L.Ed.2d 1 (1992).[2]

The majority seems to find that religious-based peremptory challenges violate the First Amendment triggering a strict scrutiny review. The majority mostly relies on United States Supreme Court First Amendment cases dealing with statutes that burdened a group's free exercise of its religion. However, in this case, the majority does not, and cannot, explain how religious-based peremptory challenges, directly or incidentally, burden the free exercise of religion. See *Johnson v. Robison*, 415 U.S. 361, 375, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974). At most, appellant can show only that some members of some religious groups may be excluded from sitting on juries in some, but not all, cases. And, the stricken veniremembers in this case offered no evidence the exercise of their religion was in any way affected by the strikes.[3]

The majority also cites *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). *Larson* held a Minnesota statute that granted a denominational preference implicated the Establishment Clause of the First Amendment because the statute preferred "one religion over another." *Larson*, 456 U.S. at 245–56, 102 S.Ct. at 1684–89.

Religious-based peremptory challenges do not constitute governmental action preferring one religion over another; therefore, *Larson* offers no support for the majority's holding. But see *J.E.B. v. Alabama*, —— U.S. ——, ——, 114 S.Ct. 1419, 1438, 128 L.Ed.2d 89 (1994) (Scalia, J., dissenting).

The majority also relies on *Juarez v. State*, 277 S.W. 1091 (1925). *Juarez* stands only for the proposition that a state may not systemically exclude all members of religious groups from ever serving as grand jurors. *Juarez*, 277 S.W. at 1094. *Juarez* is factually distinguishable from this case. In addition, *Juarez* contains no standard for reviewing religious classifications, and the purposes for the religious classifications in *Juarez* would not withstand even a "rational relationship" standard of review. See *Bankers Life and Cas. Co. v. Crenshaw*, 486 U.S. 71, 82–84, 108 S.Ct. 1645, 1653, 100 L.Ed.2d 62 (1988) (singling out a cognizable group in an arbitrary and irrational fashion violates the Equal Protection Clause even under the most deferential standard of review).

Religious-based peremptory challenges do not violate the Establishment or the Free Exercise Clauses of the First Amendment, and it has never been held that any religious group is a "suspect class deserving special judicial protection" for Fourteenth Amendment purposes. See *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976) (a "suspect class" is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"); *Johnson*, 415 U.S. 361, 375, 94 S.Ct. 1160, 1169. Therefore, I would hold religious-based per-

---

**2.** Most U.S. Supreme Court Equal Protection cases discussed in the various opinions here dealt with *statutory* classifications that generally affected cognizable groups. It is difficult to apply these cases to peremptory challenges exercised in a single trial. See, e.g., *Batson*, 476 U.S. at 122–24, 106 S.Ct. at 1737 (Burger, C.J., dissenting) (traditional equal protection analysis is

simply inapplicable to peremptory challenges exercised in any particular case).

**3.** Appellant assumed the burden to prove the peremptory challenges burdened the exercise of the veniremembers' religion, and he has not met this burden.

emptory challenges are not subject to strict scrutiny review.[4]

Also, because the history of religious discrimination in this Country does not occupy the same plane as the history of race and sex discrimination, I would hold that religious-based peremptory challenges should be reviewed under a less exacting standard than either strict or intermediate scrutiny, and that a party's valuable right in obtaining a fair and impartial jury, and a jury the party believes is fair and impartial, justifies the use of peremptory challenges based on religious stereotypes.[5] See *State v. Davis*, 504 N.W.2d 767 (Minn.1993), *cert. denied*, ——

U.S. ——, 114 S.Ct. 2120, 128 L.Ed.2d 679 (May 23, 1994) (*Batson* not extended to religious-based peremptory challenges); cf. *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1429; but see *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1439 (Scalia, J., dissenting) (*Batson* applies to any peremptory challenge based on a classification that is accorded "heightened scrutiny" under the Equal Protection Clause "which presumably would include religious belief"). Therefore, religious-based peremptory challenges should be exempted from the "special rule of relevance" of *Batson* and the subsequent cases it spawned extending this rule to other situations. See *Davis*, 504 N.W.2d at 771.[6]

4. The majority also errs to apply a more exacting standard of review to religious-based peremptory challenges (strict scrutiny) than the standard applied to sex-based peremptory challenges (intermediate scrutiny) in *J.E.B. v. Alabama*, —— U.S. ——, ——, 114 S.Ct. 1419, 1425, 128 L.Ed.2d 89 (1994). According to *J.E.B.*, the history of discrimination in this Country against women is a close second to the history of discrimination against black people justifying the heightened scrutiny standard of review to sex-based peremptory challenges. See *id.* With respect to jury selection practices, the Supreme Court has not yet decided which group is number three in this hierarchy of racial and sexual preferences. See *State v. Weatherspoon*, 514 N.W.2d 266, 281 (Minn.App.1994) (Randall, J., specially concurring).

5. However, under *Crenshaw* and *Juarez*, it is difficult to conceptualize how peremptory challenges based on *any* group stereotype would not violate Equal Protection even under a rational basis standard of review since members of that group are being singled out "in an arbitrary and irrational fashion." See *Batson*, 476 U.S. at 122–24, 106 S.Ct. at 1737 (Burger, C.J., dissenting) (traditional equal protection analysis has no application to the peremptory challenge because it is an arbitrary and capricious right); but see *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1429 (peremptory challenges based on sexual stereotypes fail heightened scrutiny equal protection analysis because they do not substantially further an important government interest, but parties may still exercise peremptory challenges based on stereotypes about members of groups subject to a "rational basis" review). It appears, at least with respect to jury selection practices, that some groups are more equal than other groups. See *id.*

6. In Footnote ten, the plurality asserts this dissenting opinion cannot contend that religious classifications are not subject to heightened scrutiny. THIS OPINION, HOWEVER, *CONCLUDES* RELIGIOUS–BASED PEREMPTORY CHALLENGES SHOULD BE REVIEWED UN-

DER A LESS EXACTING STANDARD THAN HEIGHTENED SCRUTINY. This standard apparently is the line drawn in the sand for making lawyers explain the reasons for their peremptory strikes; therefore, it is unnecessary to decide exactly which standard of scrutiny applies to religious-based peremptory challenges. This opinion also concludes this Court need not address the issue the plurality opinion addresses because it is unnecessary to the disposition of this case; this Court should dismiss the petition for discretionary review as improvidently granted. Cf. *Briggs v. State*, 740 S.W.2d 803, 806–807 (Tex.Cr.App.1987) (constitutionality of a statute should not be determined unless such a determination is absolutely necessary to decide the case in which the issue is raised).

The plurality opinion also asserts this opinion concedes its application of *J.E.B.*'s "analytical framework" is "correct." This opinion makes no such concession because, like Judge Meyers, I am not sure I really understand *J.E.B.*'s "analytical framework." What I do know about *J.E.B.* is that it addressed a practice where a party used all its peremptory strikes on men, and the Supreme Court relied on the history of discrimination in this country against women to condemn that practice and to announce sex-based peremptory challenges violate the Fourteenth Amendment. Were I to apply *J.E.B.*'s "analytical framework," I would conclude the Constitution should reflect my own personal views. More importantly, *J.E.B.*, under the guise of Equal Protection, supports the dubious proposition that parties may not use their peremptory challenges to single out in an arbitrary and irrational fashion members of some groups, but parties may do so with respect to members of groups subject to a "rational basis" review. *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1429. I must ask whether this also means the Fourteenth Amendment no longer prohibits states from passing laws that single out members of these latter groups in an arbitrary and irrational fashion? See, e.g., *Plessy v. Ferguson; Strauder v. West Virginia, infra*.

Also, the plurality erroneously asserts this dissenting opinion ignores binding precedent. It

I also urge that the social experiment started in *Batson* be aborted, and that both parties in a criminal case be allowed the traditional free use of their peremptory challenges. See *J.E.B.*, —— U.S. at —— – ——, 114 S.Ct. at 1431–33 (O'Connor, J., concurring), and at 1437 (Scalia, J., dissenting); see generally *Weatherspoon*, 514 N.W.2d at 270–301. This is necessary to help insure fair and impartial juries for both sides in criminal cases, which is still supposed to be one of the paramount goals of a criminal trial.[7] See *J.E.B.*, —— U.S. at —— – ——, 114 S.Ct. at 1431–33 (O'Connor, J., concurring); *Weatherspoon*, 514 N.W.2d at 270–301. Fair criminal trials are too important to the administration of justice in this State for the kind of nonsense *Batson* and its progeny promote. See *Weatherspoon*, 514 N.W.2d at 270–301, 274.

*Batson* and its progeny should be read in light of this Country's *history* of racial discrimination, and the precedents upon which *Batson* relies. In the light of this history and these precedents, *Batson* and its progeny are fundamentally flawed because they ignore the real purpose of the Equal Protec-

tion Clause, and the valid purposes for which peremptory challenges presently are exercised. *Batson* and its progeny pervert this Country's quest for racial equality and an end to legal segregation in the really important affairs of public life into a misguided and counter-productive exercise of which private thoughts the Constitution will tolerate, and which private thoughts it will not tolerate. See *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1438 (Scalia, J., dissenting).

The central purpose of the Fourteenth Amendment's Equal Protection Clause "is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).[8] The Equal Protection Clause is intended to prevent disparate treatment by all the resources of a state of cognizable racial groups which is "motivated by racial considerations" or a "purpose or intent to segregate."[9] *Davis*, 426 U.S. at 240, 96 S.Ct. at 2048. An "invidious" racially discriminatory *purpose* or an intent to segregate must exist to implicate the Equal Pro-

does not because there is no binding precedent, and the plurality has not cited any. The plurality still has not demonstrated how religious-based peremptory challenges violate the First Amendment, and the cases cited in Footnote fourteen of the plurality opinion in support of its "fusion analysis" do not support its holding because even though the Supreme Court "has occasionally fused the First Amendment into the Equal Protection Clause"; it has done so because *"the First Amendment underlies its analysis." R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 385, 112 S.Ct. 2538, 2544, 120 L.Ed.2d 305 (1992) (the only reason the government's interest is not a legitimate one is that it violates the First Amendment) (Emphasis Supplied). Central to the plurality's analysis is that religious-based peremptory challenges implicate the First Amendment, but the plurality still has not explained how.

Finally, this dissenting opinion suggests, respectfully and in the interest of promoting this State's legitimate interests in providing fair and impartial juries to both sides in criminal cases and protecting its citizens from the obviously guilty, that *Batson* should be reexamined. That is why this opinion sets out the facts of the case. The law, and to a certain extent the powers granted to governments under the Constitution, are intended to protect citizens from the obviously guilty, like this appellant. *Batson*, however, entitles obviously guilty and fairly tried defendants to relief even though they have not been harmed. We have traveled from the honorable purpose of preventing the systemic exclusion

from juries of members of various groups for invidious discriminatory purposes to the dishonorable purpose of allowing an obviously guilty and fairly tried defendant to assert the rights of members of various groups who were not peremptorily stricken for invidious discriminatory purposes. Extending *Batson* to other situations is beginning to impose a burden on this state's judicial resources, especially when one understands that *Batson* generally has nothing to do with whether a defendant has received a fair trial. This dissenting opinion suggests the Constitution should not be used to promote a social agenda that really has nothing to do with the Constitution. To do so trivializes this Country's history of the struggle to end invidious racial discrimination.

7. The majority also recognizes the free use of peremptory challenges "facilitate the impaneling of an impartial and unbiased jury." However, this does not qualify as a compelling governmental interest!

8. Cf. *Lanford v. Fourteenth Court of Appeals*, 847 S.W.2d 581, 585 (Tex.Cr.App.1993) (primary goal in the interpretation of a constitutional provision is to ascertain and give effect to the apparent intent of the voters who adopted it).

9. Historically, this meant state-sponsored, systemic discrimination against black people. See *Juarez*, 277 S.W. at 1094.

tection Clause.[10] See *Davis,* 426 U.S. at 238–44, 96 S.Ct. at 2047–49. "Discriminatory purpose" implies "more than intent as volition or intent as awareness of consequences;" it implies that the sovereign "selected or reaffirmed a particular course of action in part *because of,* not merely in spite of, its adverse effects upon an identifiable group." [11] *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 278–80, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (internal quotation marks omitted).

*Batson* seemed to reaffirm this understanding of the Equal Protection Clause because *Batson* only attempted to lessen a defendant's burden of proof in establishing a prima facie case of invidious racial discrimination in the prosecution's use of its peremptory challenges than what existed under prior law. See *Batson,* 476 U.S. at 83–101, 106 S.Ct. at 1716–25. In *Batson,* the defendant was black, the prosecution peremptorily struck every black veniremember, and a "jury composed only of white persons was selected." [12] *Batson,* 476 U.S. at 83, 106 S.Ct. at 1715. Now, under *Batson,* at least as this Court has interpreted it, a defendant can make a prima facie case of invidious racial discrimination in the prosecution's use

of its peremptory challenges even where members of the defendant's race actually serve on the jury. See, e.g., *Keeton v. State,* 749 S.W.2d 861, 862–63 (Tex.Cr.App.1988); but cf. *Akins v. Texas,* 325 U.S. 398, 405, 65 S.Ct. 1276, 1280, 89 L.Ed. 1692 (1945).

*Batson* and its progeny, in effect, now say it violates Equal Protection for a party to exercise peremptory challenges based solely on racial and sexual stereotypes, which abandons the traditional Equal Protection inquiry into whether peremptory challenges are motivated by invidious discriminatory *purposes.* See *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1426–30. But, *Batson* was an extension of *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880), which invalidated a West Virginia *statute* that excluded *all* black people from the initial impanelment of the venire pool. See also *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). And, *Swain,* which *Batson* later overruled, addressed a practice where prosecutors peremptorily struck every black person in every case so that no black person *ever* sat on a petit jury.[13] See *Swain,* 380 U.S. at 222–29, 85 S.Ct. at 837–40; see also *Weatherspoon,* 514 N.W.2d at 273, 284. Even *J.E.B.* relies

---

**10.** See also *City of Mobile, Alabama, v. Bolden,* 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–67, 97 S.Ct. 555, 564–65, 50 L.Ed.2d 450 (1977).

**11.** These considerations generally apply to individuals as well as cognizable groups "though group disabilities are sometimes the mechanism by which the State violates the individual right in question." *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1434 (Kennedy, J., concurring).

**12.** See also *Powers v. Ohio,* 499 U.S. 400, 429–31, 111 S.Ct. 1364, 1381, 113 L.Ed.2d 411 (1991) (Scalia, J., dissenting) (it is intolerably offensive to imprison a person on the basis of a conviction rendered by a jury from which members of the defendant's race were carefully excluded).

**13.** The *Swain* court addressed the problem as follows:

"We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury *on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular*

crime charged. But when the prosecutor in a county, *in case after case,* whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, *with the result that no Negroes ever serve on petit juries,* the Fourteenth Amendment claim takes on added significance. (Citation Omitted) In these circumstances, giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purpose of the peremptory challenge are being perverted. If the State *has not seen fit to leave a single Negro on any jury in a criminal case,* the presumption protecting the prosecutor may well be overcome. *Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify.*" *Swain,* 380 U.S. at 223–24, 85 S.Ct. at 837–38. (Emphasis Supplied).

on cases where women were *totally* excluded from the initial impanelment of the jury venire, voting and other forms of "civic life." *J.E.B.,* —— U.S. at ——–——, 114 S.Ct. at 1422–26. These precedents dealt with state action motivated by invidious discriminatory *purposes* that generally affected "cognizable groups."[14]

These jury selection practices do not occur now. States do not systemically exclude blacks and women from ever sitting on juries, and parties do not exercise peremptory challenges for invidious discriminatory purposes; they exercise them to win their case. See, e.g., *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1437 (Scalia, J., dissenting) (the pattern of peremptory challenges displayed not a systemic sex-based animus but each side's desire to get a jury favorably disposed to its case); *Swain,* 380 U.S. at 222–23, 85 S.Ct. at 837 (acceptable considerations in exercising peremptory challenges are those related to the particular case, the particular defendant involved, and the particular crime charged); *Weatherspoon,* 514 N.W.2d at 286–301. When a party exercises a peremptory on a veniremember based on a group stereotype, he does so usually because he feels the veniremember will be biased in favor of the other side, *a valid purpose,* and not because it is his "purpose or intent to segregate" or to keep all members of that veniremember's

racial or sexual group from *ever* sitting on a jury, *an invidious discriminatory purpose.*[15] See, e.g., *Swain,* 380 U.S. at 218–22, 85 S.Ct. at 835–36 (one purpose of the peremptory challenge is to eliminate extremes of impartiality on both sides).[16] Peremptory challenges so motivated surely do "not violate the sovereign's duty to govern impartially." See *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 323, 113 S.Ct. 2096, 2106, 124 L.Ed.2d 211 (1993) (Stevens, J., concurring).

Even the stereotypes upon which peremptory strikes are based are different from the "officially disapproved" stereotypes set out in many of the cases upon which *Batson* and *J.E.B.* rely. The primary evil identified in these cases was classifications, which were usually statutory, that served "to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women" and whites and blacks. See *J.E.B.,* —— U.S. at ——, 114 S.Ct. at 1422. But now, peremptory challenges based on race and sex-based stereotypes usually have something to do with the particular case which causes the lawyer to believe the veniremember will not be a fair and impartial juror. These challenges are not based on any stereotypes about the relative abilities of men and women and blacks and whites, and this practice does not "reinforce the same stereotypes about [blacks' and womens'] com-

---

**14.** The lone dissenting opinion in the historically relevant *Plessy v. Ferguson* case illustrates the conditions which the Equal Protection Clause was intended to remedy. *Plessy v. Ferguson,* 163 U.S. 537, 554–57, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896) (Harlan, J., dissenting):

"It was said in argument that the statute of Louisiana does not discriminate against either race, but prescribes a rule applicable alike to white and colored citizens. *But this argument does not meet the difficulty.* Every one knows that the statute in question *had its origin in the purpose,* not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied by or assigned to white persons. Railroad corporations of Louisiana did not make discrimination among whites in the matter of accommodation for travelers. *The thing to accomplish was,* under the guise of giving equal accommodation for whites and blacks, to compel the latter to keep to themselves while traveling in railroad passenger coaches. No one would be so wanting in candor as to assert the contrary." (Emphasis Supplied).

**15.** See *Weatherspoon,* 514 N.W.2d at 296:

"I suggest strongly that neither prosecutor nor defense attorney are interested in discrimination or bias against any person, for its own sake. As stated throughout this opinion, questions of race, color, creed, religion, [sex], ethnic origin, occupational status, age, economic status, other life experiences, are factors that filter through a competent trial attorney's mind as they attempt to judge who would be a better juror for their client. *That is the only way* peremptory strikes are used, and the only way they will be used in the future, regardless of [*Batson* and its progeny's] rhetoric." (Emphasis in Original)

**16.** See also *Feeney,* 442 U.S. at 278–80, 99 S.Ct. at 2296 (discriminatory purpose implies more than intent as volition or intent as awareness of consequences; it implies that the sovereign selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects *upon an identifiable group*) (internal quotation marks omitted).

petence or predispositions that have been used to prevent them from voting, participating on juries, pursuing their chosen professions, or otherwise contributing to civic life." See *J.E.B.*, —— U.S. at —— fn. 14, 114 S.Ct. at 1428 fn. 14; *Batson*, 476 U.S. at 85–86, 106 S.Ct. at 1717 (it violates Equal Protection to exclude members from the jury venire on account of race *based on the false assumption that members of that race as a group are not qualified to serve as jurors* ); *Weatherspoon*, 514 N.W.2d at 270–301.

Peremptory challenges, as they are used now, should not be held to be based on constitutionally impermissible purposes or constitutionally impermissible thoughts.[17] Cases like *Batson* and *J.E.B.* ill-advisedly apply precedents involving the systemic exclusion of blacks and women from ever sitting on juries to situations where these practices do not occur. Compare *Batson*, 476 U.S. at 86–88, 106 S.Ct. at 1718, with, *Batson*, 476 U.S. at 120–24, 106 S.Ct. at 1736–37 (Burger, C.J., dissenting). Most Equal Protection precedents deal with *statutory* classifications that generally affected all members of an identifiable group. No one would argue it violates Equal Protection for a statute to treat members of all groups more or less the same, although not with exact mathematical precision. This is how peremptory challenges operate since members of all groups in all cases are subject to a peremptory challenge based on a stereotype about that group. See *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1437 (since all groups are subject to the peremptory challenge, it is hard to see how any group is denied equal protection). And, although members of a particular group may not serve on a jury in a particular case, they do serve on juries in other cases. This is all the Constitution should require.[18]

The use of peremptory challenges are not motivated by race or sex discrimination as such, and they cannot "ultimately be traced to a racially discriminatory purpose" of the type the Equal Protection Clause was really meant to prohibit. See *Batson*, 476 U.S. at 92–94, 106 S.Ct. at 1721 (the 'invidious quality' of governmental action claimed to be racially discriminatory 'must ultimately be traced to a racially discriminatory purpose'). *Batson* and its progeny cross the line from preventing the systemic exclusion of "cognizable groups" from ever sitting on a petit jury to making sure people "think right." See *Weatherspoon*, 514 N.W.2d at 276, 278.

Also, it cannot be overemphasized that the time-tested, traditional free use of the peremptory challenge is a valuable right to both sides in a criminal trial:

"The principal value of the peremptory is that it helps produce fair and impartial juries. (Citations Omitted) Peremptory challenges, by enabling each side to exclude those jurors it believes will be most

---

**17.** And, *Batson* and its progeny do to a degree attempt to regulate the most private thoughts of trial lawyers, even if there is some truth to these thoughts. See *J.E.B.*, —— U.S. at —— fn. 11, 114 S.Ct. at 1427 fn. 11 (a peremptory challenge based even on a *"true"* gender-based stereotype violates Equal Protection), and at ——, 114 S.Ct. at 1436 (Scalia, J., dissenting) (even if sex was a good predictor in certain cases, the Court would find its use in peremptories unconstitutional); *Weatherspoon*, 514 N.W.2d at 276, 278 (*Batson* and its progeny require trial courts to be "thought police" and gives them the power to punish those who "don't think right" by, for example, placing on a jury a juror upon whom the defendant has exercised a peremptory challenge).

**18.** The Fourteenth Amendment is intended to protect all the civil rights pertaining to freedom and citizenship. *Plessy*, 163 U.S. at 554–57, 16 S.Ct. at 1145 (Harlan, J., dissenting). Personal freedom "consists in the power of locomotion, of

changing situation, or removing one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law." *Id.*, 163 U.S. at 557–59, 16 S.Ct. at 1146. It is difficult to understand how the use of peremptory challenges violate any citizen's "personal freedom" as we have historically come to understand what the term means. And, it is especially hard to understand how peremptory challenges can withstand scrutiny based on stereotypes about some groups and not withstand scrutiny when based on stereotypes about other groups. See Footnote 5, *supra*; *J.E.B.*, —— U.S. at ——, 114 S.Ct. at 1429. If these peremptory challenges violate the personal freedom of the members of the latter groups, then they also violate the personal freedom of the members of the less favored groups. See Footnote 5, *supra*; *Crenshaw*, 486 U.S. at 82–84, 108 S.Ct. at 1653 (singling out members of a cognizable group in an arbitrary and capricious manner violates the Equal Protection Clause even under the most deferential standard of review).

partial toward the other side, are a means of eliminat[ing] extremes of partiality on both sides, thereby assuring the selection of a qualified and unbiased jury. (Citation Omitted) The peremptory's importance is confirmed by its persistence: it was well established at the time of Blackstone and continues to endure in all the States." *J.E.B.*, — U.S. at —, 114 S.Ct. at 1431 (O'Connor, J., concurring).

The peremptory by its nature is "an arbitrary and capricious right; and it must be exercised *with full freedom, or it fails of its full purpose* (citations omitted)." *J.E.B.*, — U.S. at —, 114 S.Ct. at 1438 (Scalia, J., dissenting) (emphasis supplied); see also *J.E.B.*, — U.S. at —, 114 S.Ct. at 1431 (O'Connor, J., concurring) (essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control); *Batson*, 476 U.S. at 122–24, 106 S.Ct. at 1737 (Burger, C.J., dissenting).

With an understanding of the value of the peremptory challenge and the valid purposes for which it is used, the free use of peremptory challenges should withstand even strict scrutiny equal protection analysis. See *Weatherspoon*, 514 N.W.2d at 281 (free use of peremptory challenges should take precedence over social experiments in jury selection). But, it does not, and we must ask for what important reason, besides making sure peremptory challenges are not based on improper thoughts, the Supreme Court continues to limit the traditional free use of peremptory challenges. Does the free use of peremptory challenges deprive a defendant of a fair trial? Does the practice of totally excluding blacks and women or other "cognizable groups" from the initial impanelment of the venire continue? Are parties using their peremptories to strike blacks and women or other members of "cognizable groups" in every case so that they will never sit on a petit jury?

The answer to all of these questions, of course, is, "no." See, e.g., *Holland v. Illinois*, 493 U.S. 474, 480–488, 110 S.Ct. 803, 807–11, 107 L.Ed.2d 905 (1990) (peremptory challenges based on racial stereotypes do not produce an unfair jury, and in some circumstances it may increase fairness); see also *Powers*, 499 U.S. at 425–27, 429–31, 111 S.Ct. at 1379, 1381 (Scalia, J., dissenting) (*Batson* error entitles the guilty to relief even though the error has not harmed them); *Batiste v. State*, 888 S.W.2d 9 (Tex.Cr.App.1994) (Mot. for reh'g filed October 31, 1994). And, many blacks and women in this Country serve on juries, vote and otherwise participate in civic life; they did so when *Batson* was decided, and they will continue to do so with or without *Batson.*

The expressed justifications advanced for continuing to limit a party's valuable right to freely use his peremptory challenges are that a veniremember who is peremptorily struck based on a group stereotype might get his feelings hurt and the community as a whole might lose its respect for the criminal justice system; these are the reasons the important business of a criminal trial has become a sideshow to "mini-Batson" hearings. See *J.E.B.*, — U.S. at —, 114 S.Ct. at 1439; *Weatherspoon*, 514 N.W.2d at 289. However, "hurt feelings" should not outweigh a party's important right to freely exercise his peremptory challenges. And, it borders on the absurd to extend precedents dealing with invidious, systemic discrimination against blacks and women in the important affairs of public life to protect people from "hurt feelings."

*Batson* and its progeny also will produce juries that the parties do not believe are truly impartial which can only diminish confidence in the criminal justice system. See *Weatherspoon*, 514 N.W.2d at 286. The real justification for *Batson* and its progeny is that peremptory challenges, including those not exercised for invidious discriminatory purposes, should not be based on "improper" thoughts even if this time-tested practice helps produce fair trials, and even if there is some measure of truth to these "improper" thoughts.[19] See *J.E.B.*, — U.S. at — f.n. 11, 114 S.Ct. at 1427 f.n. 11.

Finally, as a practical matter, *Batson* and its progeny should be discarded because the truth of human experience makes it impossi-

---

**19.** Therefore, the Constitution requires litigators to deny the "truth" in some circumstances!

ble to follow them. See *Weatherspoon,* 514 N.W.2d at 297 (*Batson* hurts a defendant, humiliates the two attorneys by making them play "let's pretend," and frustrates the trial court by making it judge the pretend and not the truth). Lawyers use laundry lists of "whatever-neutral" explanations to plug into the second-step of the *Batson* "three-step *danse macabre,*" and these laundry lists are even taught at CLE seminars. See *Weatherspoon,* 514 N.W.2d at 287, 297. When the judicial resources in resolving *Batson* claims at the trial and appellate levels are considered, the dubious benefits we reap under *Batson* and its progeny are just "not worth the candle."

*Batson* and its progeny should be discarded. Meanwhile, litigators who don't think right had better watch out because the thought police might come for you and your clients next, and law-abiding citizens should understand their safety may be at risk for the folly of *Batson.* See *Powers,* 499 U.S. at 429–31, 111 S.Ct. at 1381–82 (Scalia, J., dissenting). With respect to the facts of this case, the victim may relive her experience on retrial secure in the knowledge that some "greater good" is being accomplished.

CAMPBELL, J., joins paragraph 3 of this dissent.

WHITE, Judge, dissenting.

I realize that Justice Hopkins' concurring opinion is published below; however, I want to quote it verbatim as it is *"right on the mark"* in this case:

"In *Hill v. State,* 827 S.W.2d 860 (Tex. Crim.App.1992), the majority opinion [1] contained the following: '[R]ace may be a factor coexisting with nonracial reason for a strike, however, race may not be *the* reason for the strike.' *Id.* at 866 (emphasis added). '[A]ppellant must show that the prosecutor's other explanations for his challenge were merely a pretext for discrimination.' *Id.* at 869.

"Texas has not adopted the so-called 'bright-line' rule suggested in Judge

Baird's concurring opinion in *Hill. Id.* at 875 (Baird, J., concurring).

Applying the rationale set forth by the majority in *Hill,* should the *Batson* prohibition against racial discrimination in the exercise of peremptory challenges later be extended to include prohibition against religious discrimination, as suggested by Chief Justice Hill in the dissenting opinion, I would follow *Hill, supra,* and hold that religious beliefs or affiliation as reasons for strikes may co-exist with nonreligious and nonracial reasons in the exercise of strikes. In the present case, the State, in my view, enunciated sufficient nonracial and nonreligious reasons for the exercise of the State's strikes of the two black, Pentecostal venirepersons, including the fact that one's brother was currently incarcerated and the venireperson expressed discomfort with the law applicable to the offenses charged, *i.e.,* aggravated sexual assault and sexual assault of a child. The appellant did not show that these explanations were merely a pretext for discrimination.

"It should be noted that one of the venirepersons struck appeared as number thirty-three on the list, and that the twelve jurors were obtained from the first thirty-two venirepersons. Although the prosecutor gave similar nonracial and nonreligious reasons for striking number thirty-three, none were required because striking number thirty-three did not have an impact on the composition of the jury since the jurors were obtained from the first thirty-two members of the venire panel, nor did it deprive venireperson number thirty-three the privilege of service on the jury. See *Gambel v. State,* 835 S.W.2d 788, 791 (Tex. App.—Houston [14th Dist.] 1992, no pet.); *Rodriguez v. State,* 832 S.W.2d 727, 729 (Tex.App.—Houston [1st Dist.] 1992, no pet); *Henderson v. State,* 816 S.W.2d 845, 848 (Tex.App.—Fort Worth 1991, no pet.)."

*Casarez v. State,* 857 S.W.2d, at 788–789.

The majority opinion never reveals all of the facts regarding the other reasons the prosecutor gave for striking the prospective jurors and does not address the fact that one

---

1. With all due respect to Justice Hopkins, the opinion written by Judge Maloney in *Hill v. State*

was a plurality opinion. *Hill v. State,* 827 S.W.2d, at 860.

prospective juror was never reached. In a letter brief to this Court responding to appellant's petition for review, the State urged this Court to reject appellant's arguments because he failed to "question the analysis of the concurring opinion below", noting that several of the justifications offered by the State for its strikes were "unchallenged and clearly proper." After this Court granted appellant's petition, the State argued in its reply brief that appellant failed to show that the two strikes were made solely on an allegedly impermissible basis, citing *Hill v. State*, 827 S.W.2d 860.

Similarly, the State also argued before this Court in *Hill v. State* that even if one of the factors relied upon to establish identity is shared race, it also offered reasons for its strike which were non-racial and established identity. *Hill*, at 866. The plurality opinion in *Hill* addressed this argument, holding that "race may be a factor co-existing with a non-racial reason for the strike", *id.* In contrast, Judge Baird has chosen to ignore the State's argument in the instant case, as he chose to ignore the State's argument in his concurring opinion in *Hill v. State*. The plurality opinion is all *"SMOKE AND MIRRORS."*

I respectfully dissent.

MEYERS, Judge, dissenting.

According to syndicated columnist James Kilpatrick, defense attorney Clarence Darrow's jury selection methods were profoundly influenced by racial, sexual, and religious stereotypes. Darrow preferred Irishmen on his juries because he thought them to be "emotional, kindly and sympathetic." He also "wanted Unitarians, Universalists, Jews and agnostics [, but] ... distrusted women." [1]

While it might once have been considered routine to pick jurors as Darrow did, based mainly on criteria such as these, the practice is now constitutionally risky. Indeed, two of the three criteria mentioned here have already been condemned by the United States Supreme Court as offensive to the Equal Protection Clause of the Fourteenth Amend-

ment. The question we decide today is whether the third also violates fundamental principles of fairness and equality.

After giving the matter due consideration, I am not persuaded that the United States Constitution forbids peremptory removal of prospective jurors on account of their religion, as it does on account of their race or sex. A majority of this Court, however, is induced to a contrary opinion by its reading of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court's most recent struggle with the constitutional status of peremptory challenges. *See also Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In an already obtuse area, the Court's reasoning in *J.E.B.* is even more difficult than usual to pry loose of its rhetorical matrix.

Does the Equal Protection Clause prohibit merely "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice?" 511 U.S. at ——, 114 S.Ct. at 1421. Or does it forbid any irrational "proxy for juror competence and impartiality?" *Id.* Is a discriminatory classification unconstitutional only when it "serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes?" *Id.* at ——, 114 S.Ct. at 1422. Or is any classification illegal that irrationally presumes certain persons "unqualified ... to decide important questions upon which reasonable persons could disagree?" *Id.* at ——, 114 S.Ct. at 1428.

I do not know the answers to these questions, and extracting them from *J.E.B.* is so confusing and uncertain a process that I am willing to claim very little confidence in my own conclusions. The majority herein focusses on the history of religious discrimination in America, just as *J.E.B.* focussed on the history of sexual discrimination, concluding that, because religious classification in the law is subject to strict, or at least heightened, scrutiny under the United States Constitution, a peremptory challenge exercised on the basis of religious affiliation

---

1. James Kilpatrick, *Prejudice is crucial in selection of jurors, Austin American–Statesman,* May 19, 1994, at A–13.

is constitutionally indistinguishable from a peremptory challenge exercised on the basis of race or sex. *See Larson v. Valente,* 456 U.S. 228, 244–246, 102 S.Ct. 1673, 1683–85, 72 L.Ed.2d 33 (1982); *Davis v. Minnesota,* —— U.S. ——, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (Thomas, J., dissenting). This process of reasoning is similar to that employed by the Supreme Court in *J.E.B.,* and perhaps it is even correct. But my own interpretation of *J.E.B.* suggests that the Supreme Court contemplates a difference between religious discrimination and racial or sexual discrimination which permits us to regard them differently for purposes of the jury selection process. The overriding distinction that I have settled on is that religion, unlike race and sex, is typified by an official creed.

With few exceptions, the only significant matter that members of a religious faith genuinely have in common is their belief in certain principles, doctrines, or rules. To the extent that religious believers have historically been the objects of discrimination, it is because of their beliefs and not on account of anything else. Yet discrimination on the basis of personal belief has always been considered appropriate in the jury selection context because a veniremember's beliefs reveal especially important information about his suitability for jury service. Certain religious beliefs tell us what his sympathies and prejudices are.

Persons of the same race or sex, on the other hand, are not distinguished by their beliefs, attitudes, or convictions. Because all varieties of political, moral, and religious tenets are commonly shared by people of many different races and by those of both sexes, race and sex clearly do not reveal anything especially relevant about a prospective juror's beliefs. In short, discrimination against race and sex in American history was never based upon the proposition, rational or otherwise, that women and racial minorities subscribe to a disagreeable or undesirable belief system.

To hold, therefore, that a veniremember may not be excluded on account of his religious preference is tantamount to a holding that he may not be struck on account of his beliefs. If pursued to its logical conclusion, such a holding would undercut the essential features of our jury selection system altogether because our form of government protects not only religious belief, but all manner of political, moral, social, and scientific conviction as well. The treatment of religious creed as an inappropriate basis for peremptory exclusion cannot rationally be distinguished from a similar treatment of persons on account of their Libertarian politics, their advocacy of communal living, or their membership in the Flat Earth Society.

I am aware, of course, that *J.E.B.* limits application of the *Batson* rule to an exclusion of persons on account of a classification traditionally used for irrational discrimination in our culture. Plainly, libertarians, hippies, and flat-earthers have not been the subject of such historic discrimination, and I would not trivialize the profound social disabilities under which women and racial minorities were made to suffer in this country by comparing their history to that of an odd subculture. But, try as I may, I cannot reconcile the extension of *Batson* to religious belief without also extending it to constitutionally protected beliefs of other kinds. And, in turn, I cannot make myself accept that a veniremember's belief, religious or otherwise, is an inappropriate subject for inquiry during jury selection or an impermissible basis for the exercise of peremptory strikes. In my view, if it is permissible to discriminate against prospective jurors on account of their beliefs, then it is necessarily permissible to discriminate against them on account of their religion, for discrimination on the basis of religion *is* discrimination on the basis of belief.

The Supreme Court emphasized that its holding in *J.E.B.* "does not imply the elimination of all peremptory challenges." 511 U.S. at ——, 114 S.Ct. at 1420. One consequence of this holding is that litigants may continue to discriminate on the basis of classifications not subject to strict or heightened equal protection scrutiny. It does not follow, however, that discrimination on the basis of every classification subject to such scrutiny is necessarily forbidden. For a peremptory challenge to be objectionable under the Equal Protection Clause, according to *J.E.B.,* it

must not only be based upon a classification subject to strict or heightened scrutiny, but it must also ratify or perpetuate "invidious, archaic, and overbroad stereotypes." 511 U.S. at ——, 114 S.Ct. at 1422

Attributing to women or African Americans as a group any specific moral, political, or social belief is overly broad because membership in the group does not depend upon subscription to the belief. It is invidious because individual members who do not share the belief are made to suffer the attribution anyway. But in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith. Because all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all members of the group.

Whatever may be said against the system of picking trial juries by striking individuals from a panel of eligible citizens, the practice is deeply entrenched in the American legal process, prescribed by Texas statute law, and constitutionally unobjectionable to the United States Supreme Court. Insofar as the practice was abused and has now largely been remedied by *Batson* and *J.E.B.*, the State of Texas may not permit the peremptory exclusion of jurors on the basis of irrational prejudices which violate the Equal Protection Clause. But I do not read Supreme Court jurisprudence yet to condemn exclusion on the basis of belief.

For the reasons given above, I would affirm the judgment of the Fort Worth Court of Appeals.

Before the court en banc.

*OPINION ON STATE'S MOTION FOR REHEARING OF APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

[December 13, 1995]

MEYERS, Judge.

Famed defense attorney Clarence Darrow's jury selection methods were keenly influenced by racial, sexual, and religious stereotypes. He preferred Irishmen because he thought them to be "emotional, kindly and sympathetic." Clarence Darrow, *Attorney for the Defense*, Litigation, Winter 1981, at 41, 43 (1981), *reprinted* from Esquire Magazine (May 1936). He also liked "Unitarians, Universalists, Congregationalists, Jews and other agnostics." *Id.* at 43. But he distrusted women, having "formed a fixed opinion that they were absolutely dependable" and, therefore, unlikely to be sympathetic to the defense. *Id.* at 44.

While it might once have been considered acceptable to pick jurors as Darrow did, based mainly on criteria such as these, the practice is now constitutionally risky. Indeed, two of the three criteria mentioned here have already been condemned by the United States Supreme Court. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The question we decide today is whether the third also violates fundamental principles of fairness and equality.

Appellant in the instant cause was convicted of aggravated sexual assault and his punishment assessed at confinement in the penitentiary for twelve years. During *voir dire,* the prosecutor used two of his peremptory challenges to remove black veniremembers from the jury panel. Appellant objected, claiming that the challenges were racially motivated in violation of *Batson.* But the prosecutor replied that his motives were religious, not racial, and that he had opted to remove both veniremembers, not because they were black, but because they were members of the Pentecostal Church. Appellant then objected that peremptory exclusion from jury service on the basis of religion, like exclusion on the basis of race, is forbidden by the Equal Protection Clause of the United States Constitution. U.S. Const. amend. XIV. His objection was overruled by the trial judge without elaboration.

On direct appeal, appellant cited removal of the Pentecostals as a basis for reversing his conviction. He argued that the equal protection rationale of *Batson*, forbidding racially motivated peremptory challenges, is equally applicable to challenges motivated by religious prejudice. The Court of Appeals disagreed, however, concluding that the Supreme Court intended its holding in

*Batson* to apply only in the case of peremptory challenges based on race. *Casarez v. State,* 857 S.W.2d 779, 783–84 (Tex.App.— Fort Worth 1993). We granted appellant's petition for discretionary review because it presents an important question, likely to recur, upon which the judges of the intermediate appellate court in this case disagreed. Tex.R.App.Proc. 200(c)(2), (4). On original submission, we sustained appellant's ground for review and remanded the cause to the Court of Appeals for further proceedings consistent with our opinion. But, on consideration of the State's motion for rehearing, we have decided that our original opinion misapprehended the constitutional significance of peremptory challenges based on criteria implicating First Amendment liberties. Accordingly, we now affirm the judgment of the Court of Appeals.

The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Yet the very process of governing requires discrimination. Laws, regulations, and practices of government, in order to achieve desirable social goals, must often classify people so that the official treatment each person receives is made to depend upon the class into which he falls. For example, able-bodied citizens may be required to serve in the armed forces, while the infirm are not. Implementation of the Equal Protection Clause therefore varies in each instance with the basis of the official classification.

■■■ In general, the government has broad discretion in the performance of its functions, and it may usually structure its laws in any way bearing some rational relationship to its legitimate purposes, even though an advantage or disadvantage may thereby inure to members of a certain class. *Pennell v. City of San Jose,* 485 U.S. 1, 14–15, 108 S.Ct. 849, 858–59, 99 L.Ed.2d 1 (1981). But when the government classifies individuals on a basis historically used to enforce illegal or irrational group preferences or in such a way as to inhibit the exercise of basic constitutional rights, its discretion is more limited and its classifications require a more particularized and convincing justification. Thus, for example, an official classification based on race is strictly scrutinized and considered to be incompatible with equal protection principles unless there is a compelling reason for it. *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Similarly, discriminatory practices based on sex, while not held to so strict a standard, are nevertheless viewed with more than the usual level of suspicion and are prohibited unless substantially related to the accomplishment of an important government purpose. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).

■■■ The system according to which jurors are selected for service in the courts by allowing litigants to exercise peremptory challenges against individual veniremembers is a government practice subject to these equal protection rules. *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 618–28, 111 S.Ct. 2077, 2081–87, 114 L.Ed.2d 660, 672–78 (1991). No party may exclude a prospective juror from service if the basis for exclusion is offensive to the United States Constitution. *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Because peremptory challenges are an established and valuable part of the adversary system, however, preserving the right to this method of jury selection is a legitimate interest of the government. *Batson,* 476 U.S. at 98–99, 106 S.Ct. at 1723–24. Accordingly, most peremptory challenges are not constitutionally exceptionable. But the government's interest in a system of peremptory challenges is generally not great enough to support exclusion of persons from jury service on the basis of a classification which is subject to strict or heightened scrutiny under the Equal Protection Clause. It is for this reason that peremptory challenges based on race or sex violate the United States Constitution. *J.E.B.,* 511 U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89; *Batson,* 476 U.S. 79, 106 S.Ct. 1712; *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

Whether a classification based on religious affiliation also meets the conditions for more

exacting examination under the Constitution, and if so whether it can survive such an examination, are the questions presented in the instant cause. The United States Supreme Court has not yet addressed this issue, although some members of the Court have expressed their individual views of the matter. *Davis v. Minnesota,* —— U.S. ——, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (Thomas, J., joined by Scalia, J., dissenting to denial of certiorari).

> In breaking the barrier between classifications that merit strict equal protection scrutiny and those that receive what we have termed "heightened" or "intermediate" scrutiny, *J.E.B.* would seem to have extended *Batson*'s equal protection analysis to all strikes based on the latter category of classifications—a category which presumably would include classifications based on religion. Cf. *Larson v. Valente,* 456 US 228, 244–246, 72 LEd2d 33, 102 SCt 1673 [1683–1684] (1982); *Batson,* 476 US, at 124, 90 LEd2d 69, 106 SCt 1712 [at 1737] (Burger, C.J., dissenting). It is at least not obvious, given the reasoning in *J.E.B.,* why peremptory strikes based on religious affiliation would survive equal protection analysis.

As Justice Thomas thus suggests, there is a plausible basis in constitutional jurisprudence for believing that official discrimination on the basis of religion should be treated the same as discrimination on the basis of sex for purposes of the Equal Protection Clause. But, unlike Justices Thomas and Scalia, we are not persuaded that the United States Constitution therefore necessarily forbids peremptory removal of prospective jurors on account of their religious affiliation. Although the basis for treating religion differently than race or sex under these circumstances may not be immediately apparent, we think it becomes clear on further reflection.

Laws which discriminate between individuals on the basis of their religious affiliation have not been the subject of much litigation under the Equal Protection Clause. This is undoubtedly because the United States Constitution protects persons from religious prejudice mainly by providing that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Long before the civil rights of racial minorities and women were recognized, and before ratification of the Fourteenth Amendment, a categorical prohibition against the disenfranchisement of any person on the basis of his religious belief was made by the First Amendment.

But the Equal Protection Clause is also a powerful disincentive to religious classification by the government, since discrimination on the basis of religious belief or affiliation not only interferes with the free exercise of religion by favoring one religion over another, but it also necessarily treats some individuals differently than others on account of their religious belief or practice. When this is so, the rights protected by the First and Fourteenth Amendments are virtually indistinguishable, and the constitutional analysis applicable to the government's religious classification is the same, whether raised as an equal protection claim or as a freedom of religion complaint. *See Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).

Supreme Court precedent makes it clear that religious classifications are constitutionally impermissible unless there is an unusually persuasive, perhaps even a compelling, justification for them. *Id.* at 246–47, 102 S.Ct. at 1684–85. In the present context, of course, that justification begins with the now well-known and generally accepted proposition that peremptory challenges promote selection of a jury that will be fair and impartial to both parties. This objective is, of course, fundamental to the jury system as presently conceived. So long as our method of litigation is adversarial, it is essential not only that the triers of fact be neutral and objective, but that the parties perceive them to be so. Implementing the unarticulated individual preferences of the parties achieves this purpose in a way no other method can, because it permits them to evaluate the desirability of prospective jurors according to their own subjective criteria.

But it is not ultimately the value of peremptory challenges "as an institution" that must be balanced against the evil of invidious discrimination. Rather, it is the extent to which peremptory challenges based on a particular classification actually make a significant contribution to securing a fair and impartial jury. *J.E.B.*, 511 U.S. at ——— ———, 114 S.Ct. at 1425–26. The use of peremptory challenges to exclude persons of a certain race or sex does not make such a contribution because the implication that such persons cannot be fair or will not be impartial implicitly attributes to them beliefs or attitudes on account of their race or sex which they may not actually hold. "Striking individual jurors on the assumption that they hold particular views simply because of their [race or] gender ... [therefore] denigrates the dignity of the excluded juror" without significantly improving the chances of fairness and impartiality on the jury. *Id.* at ———, 114 S.Ct. at 1428.

But excluding prospective jurors on the basis of their religious affiliation does promote fairness and impartiality on the jury. And it does so without denigrating the dignity of any individual veniremembers. With few exceptions, the only significant thing that members of a religious faith have in common is their belief in certain principles, doctrines, or rules. To the extent that they have historically been the objects of discrimination, it is on account of these beliefs and not on account of anything else. Yet discrimination on the basis of personal belief has always been considered appropriate in the jury selection context because a veniremember's beliefs reveal an especially important bit of information about his suitability for jury service. They tell us what some of his sympathies and prejudices are.

Persons of the same race or sex, on the other hand, are not distinguished by their beliefs, attitudes, or convictions. Because all kinds of political, moral, and religious tenets are commonly shared by people of many different races and by those of both sexes, race and sex clearly do not reveal much of anything about a prospective juror's beliefs. In short, discrimination against race and sex in American history was never based upon the proposition, rational or otherwise, that women and racial minorities subscribe to a disagreeable or undesirable belief system.

To hold, therefore, that a veniremember may not be excluded on account of his religious preference is tantamount to a holding that he may not be struck on account of his beliefs. If pursued with even modest rigor, such a holding would undercut the essential features of our jury selection system altogether because our form of government protects not only religious belief, but all manner of political, moral, social, and scientific conviction as well. *See United States v. Villarreal*, 963 F.2d 725 (5th Cir.1992), cert. denied 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (peremptory exclusion of prospective jurors on account of political belief does not offend equal protection principles). The treatment of religious creed as an inappropriate basis for peremptory exclusion cannot rationally be distinguished from a similar treatment of persons on account of their Libertarian politics, their advocacy of communal living, or their membership in the Flat Earth Society.

We are aware, of course, that *J.E.B.* limits application of the *Batson* rule to an exclusion of persons on account of a classification traditionally used for irrational discrimination in our culture. Plainly, libertarians, hippies, and those who believe the earth is flat have not been the subject of such historic discrimination, and it would be insensitive to trivialize the profound social disabilities under which women and racial minorities were once made to suffer in this country by comparing their history to that of an odd subculture. But, try as we may, we cannot reconcile the extension of *Batson* to religious belief without also extending it to constitutionally protected beliefs of other kinds. And, in turn, we cannot make ourselves accept that a veniremember's belief, religious or otherwise, is an inappropriate subject for inquiry during jury selection or an impermissible basis for the exercise of peremptory strikes. If it is permissible to discriminate against prospective jurors on account of their beliefs, then it is necessarily permissible to discriminate against them on account of their religion, for

discrimination on the basis of religion *is* discrimination on the basis of belief.

The Supreme Court emphasized that its holding in *J.E.B.* "does not imply the elimination of all peremptory challenges." 511 U.S. at ——, 114 S.Ct. at 1429. One consequence of this holding is that litigants may continue to discriminate on the basis of classifications not subject to strict or heightened equal protection scrutiny. It does not follow, however, that discrimination on the basis of every classification subject to such scrutiny is necessarily forbidden. For a peremptory challenge to be objectionable under the Equal Protection Clause, according to *J.E.B.*, it must not only be based upon a classification subject to strict or heightened scrutiny, but it must also fail to survive such scrutiny by ratifying or perpetuating "invidious, archaic, and overbroad stereotypes." 511 U.S. at ——, 114 S.Ct. at 1422.

Attributing to women or African Americans as a group any specific moral, political, or social belief is overly broad because membership in the group does not depend upon subscription to the belief. It is invidious because individual members who do not share the belief are made to suffer the attribution anyway. But in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith. Because all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them.

■ Whatever may be said against the system of picking trial juries by striking individuals from a panel of eligible citizens, the practice is deeply entrenched in the American legal process, prescribed by Texas statute law, and constitutionally unobjectionable. Insofar as the practice has been compromised by *Batson* and *J.E.B.*, the State of Texas may not permit the peremptory exclusion of jurors on the basis of irrational prejudices which violate the Equal Protection Clause. But we do not read Supreme Court jurisprudence yet to condemn exclusion on the basis of belief. We therefore hold that the interests served by the system of peremptory challenges in Texas are sufficiently great to justify State implementation of choices made by litigants to exclude persons from service on juries in individual cases on the basis of their religious affiliation.

For the reasons given above, the State's motion for rehearing is granted and the judgment of the Fort Worth Court of Appeals is affirmed.

McCORMICK, P.J., adhering to the views expressed in my dissenting opinion on original submission, I join the opinion of majority on rehearing.

CLINTON, OVERSTREET and MALONEY, JJ., dissent.

MANSFIELD, Judge, concurring.

I agree with the Court's conclusion that the Equal Protection Clause of the Fourteenth Amendment does not prohibit the State from peremptorily challenging a venireperson on the basis of religious belief. Accord *State v. Davis*, 504 N.W.2d 767 (Minn. 1993), cert. denied, —— U.S. ——, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994). I write separately to explain why I believe that conclusion is well-founded.

### *The Relevant Facts*

Appellant, George Toby Casarez, was charged and found guilty by a jury of aggravated sexual assault. During the voir dire portion of appellant's trial, appellant objected to the prosecutor's peremptory challenges of two black venirepersons. Appellant contended that the challenges were racially motivated and thus prohibited by the Equal Protection Clause. See *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor responded that he struck the venirepersons not because they were black but because, among other things, they were Pentecostals:

It's been my experience from a number of jury panels, in more than 70 felony jury trials and 27 misdemeanor jury trials, that people from that religion often have a problem in passing judgment on other persons, and that they often believe that that is a matter for God and not for man. And that they have trouble not so much, Your Honor, although some do, with the guilt

phase of the trial, but especially the punishment phase of the trial, and they are want to—want probation rather than to be responsible, in their eyes, for sending someone to the penitentiary, thereby judging them.

Appellant, unimpressed by the prosecutor's race-neutral explanation, argued that the Equal Protection Clause also prohibited peremptory challenges on the basis of religious belief. The trial court allowed the peremptory challenges to stand, however.

On appeal, appellant reiterated his argument that the Equal Protection Clause forbade peremptory challenges on the basis of religion, but the Second Court of Appeals, sitting en banc, disagreed. *Casarez v. State,* 857 S.W.2d 779 (Tex.App.—Fort Worth 1993). We granted appellant's petition for discretionary review to determine whether the court of appeals misinterpreted the requirements of the Equal Protection Clause.

### *Batson and J.E.B.*

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." The Court recognized the value of peremptory challenges in assuring the selection of a fair and impartial jury, *id.* at 90–92, 106 S.Ct. at 1720, but the Court also recognized that the "central concern of the ... Fourteenth Amendment was to put an end to governmental discrimination on account of race," *id.* at 85, 106 S.Ct. at 1716. The Court then concluded that that "central concern" required that a potential juror not be denied an important opportunity to participate in civic life simply because of his race. *Id.* at 87–88, 106 S.Ct. at 1718.

In *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. ——, ——, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994), the Court went further and held that, consistent with the equal protection guarantee, litigants may not strike potential jurors solely "on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man." The Court again recognized the value of peremptory challenges, *id.* at ——, 114 S.Ct. at 1429, but reasoned that "[w]hen state actors exercise peremptory challenges in reliance on gender stereotypes, they ratify and reinforce prejudicial views of the relative abilities of men and women," *id.* at ——, 114 S.Ct. at 1427. The Court conceded that *all* peremptory challenges are based on stereotypes of some kind, but it argued that "where peremptory challenges are made on the basis of group characteristics *other than race or gender* (like occupation, for example), they do not reinforce the same stereotypes about the group's competence or predispositions that have been used to prevent them from voting, participating on juries, pursuing their chosen professions, or otherwise contributing to civic life." *Id.* at ——, fn. 14, 114 S.Ct. at 1428, fn. 14 (emphasis added). Essentially the same point was made by a commentator three years before *J.E.B.* was handed down:

If the Court plans to keep peremptory challenges but satisfy the requirements of the equal protection clause, *the only limitation to peremptory challenges, other than the prohibition against racial-based exclusion, should be the prohibition against gender-based exclusion.* Prohibition of gender-based peremptory challenges is not only a logical extension of the *Batson* prohibition, but is also the logical place to end the restructuring of the peremptory challenge. Some commentators have argued that a distinction cannot be made between gender and other classifications. As [Chief] Justice Burger noted in his dissent in *Batson,* the conventional equal protection principles would have to include prohibition of peremptory challenges based not only on race and sex, but also on "religious or political affiliation, mental capacity, number of children, living arrangements, and employment in a particular industry." However, while courts have held that the equal protection clause specifically requires that no person in a similar situation be treated disparately, the [Supreme] Court only applies heightened

scrutiny to members of suspect classes. The people belonging to the classifications mentioned by the Chief Justice are not accorded heightened scrutiny. The Court has never afforded the kind of protection it has given to classifications based on race or gender to the classifications mentioned by Justice Burger. *The reason that higher protection has been withheld from the people belonging to the classifications that Justice Burger mentioned is because, according to the Supreme Court, those people have not experienced the kind of discrimination historically suffered by people belonging to a certain race or gender.*

Comment, *Reconstruction of the Peremptory Challenge System: A Look at Gender-Based Peremptory Challenges,* 22 Pac.L.J. 1305, 1329 (1991).

In summary, it is clear from the text of the *Batson* and *J.E.B.* opinions that they are grounded on the need to address our Nation's historical and uniquely painful and destructive patterns of race and sex discrimination. The constitutional guarantee of equal protection simply requires special protection in those contexts, even with respect to the use of "peremptory" challenges. The *Batson* and *J.E.B.* opinions do not suggest that the Equal Protection Clause prohibits peremptory challenges based on group characteristics that, like religion, have not been the focus of such pervasive and hurtful discrimination. In fact, the *J.E.B.* opinion suggests quite the opposite.

### The First Amendment

The First Amendment guarantees the freedom of religion, speech, press, assembly, petition, and association. See generally R. Rotunda, et al., *Treatise on Constitutional Law: Substance and Procedure* § 18.40 (2nd ed. 1992). If the Equal Protection Clause forbids peremptory challenges based on religious belief, then there is no principled reason why it would not also forbid peremptory challenges based on the exercise of all the other First Amendment freedoms. Thus, if litigants may not strike a venireperson because of his religious beliefs, then they also may not strike a venireperson because, for example, he is a member of a white suprema-

cists' organization or because he advocates repeal of all laws criminalizing sex with minors. Such an extension of *Batson* would spell the utter destruction of the peremptory challenge, as the Court of Appeals for the Fifth Circuit recently recognized in *United States v. Villarreal,* 963 F.2d 725, 728–729 (5th Cir.), cert. denied, 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992). Nothing in the *Batson* or *J.E.B.* opinions suggests or implies that the Equal Protection Clause requires such a result.

### Necessary to Achieve A Compelling State Interest

The Supreme Court has developed standards for determining the validity of state action that is challenged as violative of the Equal Protection Clause. The general rule is that state action is presumed to be valid and will be sustained if the classification drawn by the state action is rationally related to a legitimate state interest. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). If the classification is based on gender, then it will be presumed to be invalid and will be sustained only if it is substantially related to an important state interest. *Id.* at 441–42, 105 S.Ct. at 3255. Finally, if the classification is based on race, alienage, or national origin, or if the classification impinges on the exercise of a fundamental right, then it will again be presumed to be invalid and will be sustained only if it necessary to the attainment of a compelling state interest. *Id.* at 439–40, 105 S.Ct. at 3254.

Freedom of religion is a fundamental right. *Dinkins v. State,* 894 S.W.2d 330, 341, fn. 9 (Tex.Crim.App.1995); *Clark v. State,* 665 S.W.2d 476, 480, fn. 3 (Tex.Crim.App.1984). And, a fair and impartial jury is plainly a compelling state interest. See *J.E.B.,* 511 U.S. at ——, fn. 8, 114 S.Ct. at 1426, fn. 8. Therefore, assuming *arguendo* that peremptory challenges based on venirepersons' religious beliefs impinge on those venirepersons' freedom of religion, the question becomes whether such peremptory challenges are nonetheless *necessary* to the attainment of a fair and impartial jury. If the answer is

"yes," then the challenge is valid under the Equal Protection Clause. I believe the answer is "yes."

A juror's religious training and beliefs may seriously affect his views, either consciously or unconsciously, on many issues that might arise in a criminal case: abortion, extramarital sexual relations, homosexuality, divorce, prostitution, alcohol consumption, illicit drug use, gambling, capital punishment, even political affiliation. Furthermore, a juror's religious training and beliefs may seriously affect his willingness or even his ability to sit in judgment or assess punishment. For these reasons, it is essential for litigants to question venirepersons about their conscious religious beliefs as well as the church teachings to which they might have been exposed over their lifetimes. It is equally essential, in order for a fair and impartial jury to be attained, for the litigants to be able to use peremptory challenges based on the information they acquire through this questioning.

The right of a criminal defendant, whose life or liberty may be at stake, to be judged by a fair and impartial jury far outweighs the peripheral burden placed on the free exercise of religion by an individual struck based on his religious beliefs. It would be absurd to suggest, for example, that an African American defendant should be barred from using a peremptory challenge to strike a venireperson who adheres to a religion that advocates white supremacy. The State, as representative of the people, has an equally strong interest in assuring that criminal juries are fair and impartial, and it must be free to use peremptory challenges to strike venirepersons whose religious beliefs reasonably call into question their ability to be fair and impartial.

With these observations, I join the opinion of the Court.

**BAIRD, Judge, dissenting.**

On original submission we held the Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges on the basis of religion. We granted rehearing to determine the limited issue of whether we misapplied First Amendment jurisprudence in reaching that holding. The majority, purportedly seeking to resolve that issue, states that our opinion on original submission misapprehended the constitutional significance of peremptory challenges based on criteria implicating First Amendment liberties.[1] *Ante* at 493. The majority ultimately holds the governmental interests served by peremptory challenges are sufficiently compelling to permit discrimination on the basis of religion. *Ante* at 496. To achieve this result the majority opinion rests on three fundamentally flawed theories: first, that the beliefs of a religion are held by all members of that religion, *ante* at 496; second, that there is a compelling governmental interest that permits discrimination on the basis of religion, *ante* at 496; and, third, that the proper focus to resolve the ground for rehearing is the veniremember's religious belief(s) rather than the veniremember's right to serve on a jury. We will discuss each theory *seriatim*.

**I.**

The majority uses religion, religious affiliation, religious group, religious creed, religious faith and religious preference interchangeably. I will use the term religion because that is the term used in the First Amendment. The majority states: "Because all members of the [religious] group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them." *Ante* at 496. Consequently, "it is necessarily permissible to discriminate against veniremembers on account of their religion, for discrimination on the basis of religion *is* discrimination on the basis of be-

---

1. I am not quite sure what the majority means by "the constitutional significance of peremptory challenges." The issue presented in this case involves the classification of a Constitutional right, namely freedom of religion, against a statutory right, namely the exercise of peremptory challenges. There is nothing in the Constitution of the United States which requires the peremptory challenge. *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919). Therefore, notwithstanding the majority's statement to the contrary, the peremptory challenge has no "constitutional significance."

lief." *Ibid.* This premise is fundamentally flawed for at least three reasons.

### A.

First, there is precedent from this Court holding to the contrary. In *Urbano v. State,* 837 S.W.2d 114, 117 (Tex.Cr.App.1992), we held it is irrational to conclude simply from membership that one is aware of all of the rules of an organization.

Additionally, there is decisional authority from other jurisdictions. In *Coleman v. United States,* 379 A.2d 951 (D.C.Ct.App. 1977), the defendants were charged with robbing of the priests and patrons of a Catholic rectory. At trial, the defendants moved to exclude all Catholics from the jury. This motion was premised on the assumption that Catholics would be unable to impartially judge the truth or falsity of the testimony of Catholic clerics. The trial judge overruled the motion and the Court of Appeals affirmed, holding:

> ... No evidence was presented to the trial court to support this bald assertion. Appellants single out Catholics in this regard when it could be argued with equal force that because of the prevalence of religious belief in this country, many members of our society generally of whatever faith may be predisposed to believe that clerics can be trusted to always tell the truth. In other words, what appellants contend with regard to Catholics specifically could be contended as well with regard to anyone who acknowledges a belief in some religious faith when confronted with a cleric as a witness.

*Id.,* 379 A.2d at 953. The Court continued, "mere potentiality for bias based upon religious affiliation cannot justify the elimination of a prospective juror." *Ibid.*

In *United States v. Greer,* 968 F.2d 433, 435 (5th Cir.1992), the defendants belonged to the Confederate Hammerskins, a white supremacy group, and were charged with conspiring to deprive Black, Hispanic and Jewish citizens of their rights secured by the United States Constitution.[2] The defendants moved to exclude all Blacks, Hispanics, and Jews from the venire, arguing such veniremembers, as a class, could not be fair or impartial. The trial judge denied the motion, and the Court of Appeals affirmed. The Court was unwilling to hold that all members of a religious class should be excluded in cases where members of that class are the victims. Instead, the Court required a showing of individual bias. *Id.* 968 F.2d at 435. And though the defendants contended the Jewish veniremembers could only harbor bias, the Court of Appeals held the pertinent question was whether the *individual veniremembers* harbored any bias.

Finally, in *Rose v. Sheedy,* 134 S.W.2d 18, 19 (Mo.1939), the Missouri Supreme Court held religious affiliations constitute neither a qualification nor a disqualification for jury service. Consequently, inquiry into a veniremember's religious beliefs is proper on voir dire only where religious issues are expressly presented in the case, where a religious organization is a party to the litigation, or where the inquiry is a necessary predicate to the exercise of peremptory challenges. *Coleman,* 379 A.2d at 954. But for the peremptory challenge to be permissible, it must follow *individual inquiry* of the veniremember. Only in this way can the peremptory challenge be knowingly and intelligently made and serve to prevent the discriminatory exclusion of veniremembers based on unconstitutional stereotypes. The United States Supreme Court has emphasized the importance of asking specific questions designed to unearth the views of prospective jurors. *Morgan v. Illinois,* 504 U.S. 719, 729–31, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992). Probing inquiry into the individual veniremember's views or beliefs is necessary. As stated in *Greer,* the determination of whether the individual veniremember holds a particular belief is a prime function of voir dire examination. *Id.,* 968 F.2d at 435, n. 3.[3]

---

**2.** Some of the charges resulted from the vandalizing of Jewish temples.

**3.** The cases discussed in this section are ignored by the majority just at the majority ignores the fact that the Pentecostal veniremembers were *not* peremptorily challenged for their religious beliefs. Rather, the veniremembers were excluded because of the prosecutor's stereotypical view that Pentecostals have difficulty sitting in judgment of others and have a propensity to impose

## B.

Second, as an empirical matter, we know that every member of a given religion has *not* adopted the views of their religious leaders. We pointed this out on original submission, *ante* at 479, n. 15, but it bears repeating and elaboration here. The Catholic Church officially condemns the use of artificial contraceptives, Maddox, *The Pope and Contraception*, 29 (1991), but 84% of the members of the Catholic Church believe Catholics should be allowed to use artificial contraceptives. Gallup, *The Gallup Poll: Public Opinion 1993* 145 (Wilmington, Del.: Scholarly Resources, 1994). Consequently, if a party peremptorily challenged a Catholic veniremember because the party attributed to the veniremember the Catholic Church's condemnation of the use of artificial contraceptives, the party would be wrong 84% of the time.

## C.

Finally, it is illogical to attribute every belief held by a religion to its members. We have too many religions to list. Some religions hold complex views and positions, while others hold very simple beliefs, namely those established solely to achieve an IRS tax exemption. Typically, religions which hold complex views and positions reduce them to writing. For example, the United Methodist Church publishes *The Book of Resolutions.*[4] The book is a collection of all current and official policies, and other resolutions adopted by the General Conference of The United Methodist Church. These policies and resolutions are subject to change and many are changed every four years. *The Book of Resolutions* was first published in 1968, and currently contains official policy statements on approximately two hundred subjects including: reduction of water usage by United Methodists, care-giving teams for persons with AIDS, organ and tissue donation, sexual violence and pornography, access of Hispanics to higher education, African–American family life, available and affordable housing, communications access for persons who have hearing and sight impairments, Native–American ministries, confronting the drug crisis, domestic violence and sexual abuse, equal rights of women, eradication of racism, health for all by the year 2000, school busing, suicide, bilingual education, gambling, rights of workers, gun control, grand jury abuse, unemployment, police firearms policies, concern for El Salvador, the U.S. military presence in Bolivia and recognition of Cuba. These categories represent just a sampling of policies adopted by one religion.

It is absurd to assume, as the majority does, that all Methodists are even aware of the Methodist Church's positions on housing, busing or gun control. And the majority fails to explain how the Methodist Church's formal position on pornography is necessarily reflective of its members beliefs on the same issue. Is it reasonable to assume that every Methodist has a view on El Salvador, Bolivia or Cuba? If so, is it reasonable to assume that those Methodists who have such views necessarily hold the same views as other Methodists with respect to gambling and suicide? But this is precisely the majority's holding: "Because all members of the [religious] group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them." *Ante* at 496.[5] The holding begs reality.

probationary sentences. *There is no showing that these are beliefs of the Pentecostal religion nor were the veniremembers individually questioned to determine if they held those beliefs as a result of their membership in the Pentecostal religion.* Rather than make unfounded assumptions, litigants should question the venire as to their beliefs. Such a properly conducted voir dire will inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular religion both unnecessary and unwise. *See, J.E.B.,* 511 U.S. at ——, 114 S.Ct. at 1429.

Additionally, I believe the majority's reliance on *United States v. Villarreal,* 963 F.2d 725 (5th Cir.1992), for the proposition that peremptorily challenging veniremembers on account of their political beliefs does not offend equal protection principles is misplaced. *Ante* at 495. *Villarreal* is of limited precedential value because it was delivered *before* the rationale of *Batson* had been extended beyond race.

4.  UNITED METHODIST CHURCH, THE BOOK OF RESOLUTION OF THE UNITED METHODIST CHURCH (United Methodist Pub. House 1992).

5.  The majority's notion of unanimity of belief by all members of a religion is contrary to our fundamental right to the free exercise of religion. As the Supreme Court has held:

## D.

A fundamental tenet of the Equal Protection Clause is that the government must treat citizens as individuals, not simply as components of a racial, religious, sexual, or national class.[6] This fundamental teaching is especially important in the context of our jury system because a juror sits *not* as a representative of a group but as an individual citizen. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. ——, ——, 114 S.Ct. 1419, 1434, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring). The majority ignores this tenet and permits discrimination on the mistaken notion that all members of a religion necessarily hold the same beliefs. This is contrary to settled precedent, empirical data and common sense. Nevertheless, this stereotyping is the foundation upon which the majority opinion rests.

## II.

On original submission, relying on the authority and reasoning in *J.E.B.* and *McCollum,* we held there was no compelling governmental interest that permits discrimination on the basis of religion. *Ante* at 480. Today's majority finds such a compelling governmental interest, *ante* at 496, but cites no authority for its holding. As

can be seen below, the majority's holding can not withstand dispassionate analysis.

## A.

The Supreme Court has developed three levels of review to determine whether the governmental interest is sufficient to permit a discriminatory practice to pass constitutional muster. In descending order, those levels are strict scrutiny review, intermediate scrutiny review, and rational relationship review.[7] In the context of strict scrutiny review, discrimination will not pass constitutional muster absent a compelling governmental interest. Racial discrimination must pass strict scrutiny review. In this context, the Supreme Court has held that the need to prohibit racial discrimination is greater than the governmental interest of permitting race-based peremptory challenges. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 629–631, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991); *and, Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Discrimination on the basis of religion is also subject to the strict scrutiny standard of review.[8] Consequently,

---

... If all expression of religion or opinion, however, were subject to the discretion of authority, our unfettered dynamic thoughts or moral impulses might be made only colorless and sterile ideas. To give them life an force, the Constitution protects their use. No difference of view as to the importance of the freedoms of press or religion exist. They are fundamental personal rights and liberties. *Jones v. City of Opelika. Bowden et al.,* 316 U.S. 584, 594, 62 S.Ct. 1231, 1237, 86 L.Ed. 1691 (1942). By permitting peremptory challenges based on religion, the majority "in effect makes abandonment of one's own religion or conformity to religious beliefs of others, the price of" jury service. *Employment Division, Dept. Human Resources v. Smith,* 494 U.S. 872, 897, 110 S.Ct. 1595, 1610, 108 L.Ed.2d 876 (1990) (O'Connor J., Concurring).

6.  *See, Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Anderson v. Celebrezze,* 460 U.S. 780, 794, 103 S.Ct. 1564, 1572, 75 L.Ed.2d 547 (1983); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *and, United States v. Caro-*

*lene Products,* 304 U.S. 144, 151–154, 58 S.Ct. 778, 783–784, 82 L.Ed. 1234 (1938). *See also, J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. ——, ——, 114 S.Ct. 1419, 1434, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring); *and, Arizona Governing Committee v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983).

7.  Classifications subject to strict scrutiny review or intermediate scrutiny review are said to be subject to "heightened Equal Protection scrutiny." *Ante,* 913 S.W.2d at 474 (on original submission).

8.  In its latest opinion addressing the right to free exercise of religion, the Supreme Court reiterated that classifications affecting the fundamental right to religious freedom must satisfy strict scrutiny. *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993):

    ... To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests. The compelling interest stan-

it follows that if the government failed to establish a compelling reason for discrimination on the basis of race, the government will, likewise, be unable to establish a compelling reason for discrimination on the basis of religion.

In the context of intermediate scrutiny review, the discrimination will not pass constitutional muster unless the discrimination is substantially related to an important government objective. Gender discrimination is subject to this standard of review. *J.E.B.*, 511 U.S. ——, ——, 114 S.Ct. 1419, 1429. In this context, the Supreme Court held gender-based peremptory challenges were *not* substantially related to any important governmental objective. *Id.*, 511 U.S. at —— n. 6, 114 S.Ct. at 1425 n. 6. Consequently, if the government failed to establish a constitutionally permissible reason to discriminate under this lower level of scrutiny, it follows that the government cannot prevail under the strict scrutiny standard of review accorded religious discrimination. To put this in a slightly different context, if a party cannot prove its case by a preponderance of the evidence, it necessarily follows that the party cannot prove its case beyond a reasonable doubt. *Ex parte Tarver*, 725 S.W.2d 195 (Tex.Cr. App.1986).

Since *Batson*, whenever the Supreme Court has been asked whether the government's interest in a fair trial permitted the discriminatory use of peremptory challenges,

the answer has been no. The argument has been rejected at every turn, perhaps most succinctly and forcefully in *McCollum*, 505 U.S. at 57–58, 112 S.Ct. at 2358, where the Court stated: "It is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens...." [9]

### B.

The majority's true fear is that our holding on original submission will ultimately lead to the end of peremptory challenges. But their fear is unfounded. As the Supreme Court stated in *J.E.B.*: "Our conclusion that litigants may not strike potential jurors solely on the basis of gender does not imply the elimination of all peremptory challenges." *Id.*, 511 U.S. at ——, 114 S.Ct. at 1429.

What should be clear from *Batson*, *J.E.B.* and our opinion on original submission is that peremptory challenges are still viable under the Equal Protection Clause. The Equal Protection Clause forbids only the exclusion of veniremembers *on the basis of stereotypes* associated with race, gender, or religion.[10] As the Supreme Court stated in *Edmonson v. Leesville Concrete Co.*, 500 U.S. at 630, 111 S.Ct. at 2088, if the sanctioning of discrimination and stereotypes are the price for acceptance of a jury panel as fair, the price is too high to meet the standard of the Constitution. When we weigh the constitutional guarantee of freedom from discrimination

---

dard that we apply ... really means what it says. A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive *strict scrutiny* only in rare cases.
*Id.*, 508 U.S. at ——, 113 S.Ct. at 2233 (citations and quotations omitted).

9. In *Ristaino v. Ross*, 424 U.S. 589, 596, n. 8, 96 S.Ct. 1017, 1021, n. 8, 47 L.Ed.2d 258 (1976), the Supreme Court stated:

... In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or *the choice of religion*.
[Emphasis added.]

10. Peremptory challenges of members of a class subject to heightened equal protection scrutiny

on the basis of their personal beliefs are not unconstitutional so long as those beliefs are related to the particular case being tried. The only unconstitutional peremptory challenges are those exercised on the basis of a stereotype attributed to a class subject to heightened equal protection scrutiny. If the veniremember holds personal beliefs that are unacceptable, that veniremember may be peremptorily challenged. However, the Equal Protection Clause prohibits peremptorily challenging a member of a class subject to heightened equal protection scrutiny based on stereotypical assumptions attributed to that class. In the instant case, had the individual veniremembers been questioned about their beliefs and expressed a belief unacceptable to the State, when viewed in relation to the instant case, they could have been peremptorily challenged. Under those circumstances the veniremembers would have been excused on the basis of their personal beliefs and not on a stereotypical assumption based on their religion.

against the governmental interest in the peremptory challenge, the scales of justice must lean in favor of the Constitution. Simply stated, the constitutional protection against discrimination is more important than the statutory right to exercise peremptory challenges in a discriminatory manner.[11]

### III.

We now turn to the third fundamental flaw of the majority opinion, the change of focus which results in the misapplication of the analytical framework of *J.E.B.*

### A.

The majority agrees that *J.E.B.* provides the analytical framework to resolve the instant issue. The majority states:

> We are aware ... that *J.E.B.* limits application of the *Batson* rule to an exclusion of persons on account of a classification traditionally used for irrational discrimination in our culture.

*Ante*, 913 S.W.2d at 495. *Compare, Ante*, 913 S.W.2d at 474–75 (opinion on original submission). Given our agreement on the analytical framework adopted by the Supreme Court in *J.E.B.*, the reader might ask how today's majority could reach a different result on rehearing. The reason is quite simple, the majority does *not* follow *J.E.B.* The majority states:

> *It does not follow, however, that discrimination on the basis of every classification subject to such scrutiny is necessarily forbidden.*

*Ante*, 913 S.W.2d at 496 (emphasis added).

This is done purposefully to change the focus of the analysis to whether the peremptory strike interferes with the veniremembers' right to free exercise of religion.[12] The free exercise of religion is relevant only to the determination of whether the discriminatory use of peremptory challenges is subject to heightened Equal Protection scrutiny.[13]

The majority's sleight of hand, done to avoid applying *J.E.B.*'s analytical framework, is intellectually dishonest. In *Davis v. Minnesota* Justice Thomas stated:

> Once the scope of the logic in *J.E.B.* is *honestly* acknowledged, it cannot be glibly asserted that the decision has no implications for peremptory strikes based on classifications other than sex, or that it does not imply further restrictions on the exercise of the peremptory strike outside the context of race and sex.

*Id.*, —— U.S. ——, ——, 114 S.Ct. 2120, 2122, 128 L.Ed.2d 679 (1994) (Thomas, J., dissenting to the denial of certiorari) (emphasis added).

---

**11.** Our fundamental right to the free exercise of religion must be "zealously protected ... even at the expense of ... admittedly high social interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).

**12.** This misdirected focus is an obvious rabbit trail because the unconstitutional exclusion of a veniremember does not affect the veniremember's religious affiliation. The Pentecostal veniremembers were still Pentacostals after their unconstitutional exclusion just as the veniremembers unconstitutionally excluded in *Batson* were still African–Americans and the male veniremembers unconstitutionally excluded in *J.E.B.* were still males. Consequently, as seen in part III B, *infra*, the focus must be on whether their class was entitled to heightened Equal Protection scrutiny.

The unconstitutional peremptory challenge need *not* directly affect the veniremember's religion. In *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963), the

Court said if the purpose is to "discriminate ... between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." *Ibid.* (Quoting *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1960).) Indirect harm is sufficient because the opportunity to serve on a jury is a civil right afforded to all citizens as an incident of their citizenship, and allowing a party to strike a potential juror solely because of religion without showing a more specific bias on behalf of the veniremember imposes a burden on the juror's free exercise of religion. *State v. Levinson*, 71 Haw. 492, 795 P.2d 845, 849 (1990).

**13.** That is, if the veniremember's right to the free exercise of religion is fundamental, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), then the infringement of that right is subject to heightened Equal Protection scrutiny. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

## B.

Our proper focus should be whether the Pentecostal veniremembers held a right to not be discriminated against in the selection of appellant's jury. Veniremembers have the right to *not* be discriminated against in the use of peremptory challenges. *Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). *See also, J.E.B.*, 511 U.S. at ——, 114 S.Ct. at 1434 ("All persons ... have the right not to be excluded [from jury service] summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination.").

Veniremembers as well as litigants enjoy equal protection rights to jury selection procedures free from discrimination. *Hernandez v. New York*, 500 U.S. 352, 355, 111 S.Ct. 1859, 1864, 114 L.Ed.2d 395 (1991); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *and, McCollum*, 505 U.S. 42, 112 S.Ct. 2348 (1992). The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for the jury system.

> ... It affords ordinary citizens a valuable opportunity to participate in a process of government an experience fostering ... a respect for the law. For most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.

*Powers*, 499 U.S. at 407, 111 S.Ct. at 1369 (quoting *Duncan v. Louisiana*, 391 U.S. 145, 187, 88 S.Ct. 1444, 1469, 20 L.Ed.2d 491 (1968) (Harlan, J., dissenting)). And the Supreme Court has recognized the right to participate in jury service to be a basic right incident to citizenship in our country which is second only to the right to vote. *Powers*, 499 U.S. at 407, 111 S.Ct. at 1369; *and, Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) ("Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise.").[14] Jury service is an exercise of responsible citizenship by the community, and is often the only opportunity some citizens have to contribute to the community. *Powers*, 499 U.S. at 407, 111 S.Ct. at 1369.[15]

Discriminatory jury selection harms the excluded veniremember because it denies the veniremember's right to participate in jury service.[16] Indeed, the Supreme Court held the entire community is harmed by the discriminatory exclusion of citizens from jury service. *Powers*, 499 U.S. at 407–408, 111 S.Ct. at 1368–1369. Discriminatory jury selection practices undermine "public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87–88, 106 S.Ct. at 1718; *and, Curry v. Bowman*, 885 S.W.2d 421 (Tx.Cr.App.1993). In *McCollum*, the Supreme Court stated:

> ... [I]f the court allows a juror to be excluded because of a group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.

*Id.*, 505 U.S. at 49–50, 112 S.Ct. at 2354. Thus, discriminatory jury selection practices cast a shadow over the criminal justice system, harming not only the litigants but the entire judicial process.

---

**14.** Jury service is perhaps the most powerful function an ordinary citizen will perform. Here *the juror's vote is equal to the sovereign.* It is here the juror may validate or invalidate the governmental exercise of power.

**15.** A study by William R. Pabst Jr. found 90% of those who served as jurors were favorably impressed with jury duty and felt more favorable toward it than before their service. *The Myth of the Unwilling Juror*, 60 Judicature 164, 165 (1976).

**16.** In *Lockhart v. McCree*, 476 U.S. 162, 175, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986), the Supreme Court stated:

> [T]he exclusion from jury service of large groups of individuals not on their inability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background, undeniably gave rise to an "appearance of unfairness." Finally, such exclusion improperly deprived members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases.

Because, each citizen holds an equal right to participate in jury service it follows that the Pentecostal veniremembers in the instant case held the right to *not* be discriminated against in the selection of appellant's jury.

## IV.

This said, it becomes clear that our opinion on original submission correctly addressed the issue before the Court. We traced the application of the Equal Protection Clause to the jury selection process from *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879), through the Supreme Court's latest pronouncements in *J.E.B. Ante*, 913 S.W.2d at 492–95. We reviewed *J.E.B.*, and its analytical framework which prohibits the use of peremptory challenges to exclude veniremembers on the basis of classifications subject to heightened Equal Protection scrutiny. *Id.*, 913 S.W.2d at 472–75. We traced religious discrimination from our country's inception through the Supreme Court's latest statements in *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), and determined that discrimination based upon religion is subject to heightened Equal Protection review. *Ante*, 913 S.W.2d at 475–79. And finally we determined there was not a compelling governmental interest in excluding veniremembers on the basis of religion. *Id.*, 913 S.W.2d at 479–80. The opinion on original submission was grounded on established Supreme Court authority.[17] I believe that analysis is the type of analysis contemplated by the Supreme Court under the analytical framework of *J.E.B.*[18]

## V.

Let there be no mistake, today a majority of this Court sanctions, even encourages, the discrimination of our citizens on the basis of their religion. This type of discrimination will harm the litigants, the excluded veniremembers and our judicial system. By allowing peremptory challenges based on religion, we violate the Equal Protection Clause's fundamental guarantee that our government will treat its citizens as individuals rather than stereotypical components of a religious class. We forget that a juror serves not as a repre-

17. Our holding on original submission that religious discrimination has no place in the jury selection process was not novel. *State v. Levinson*, 71 Haw. 492, 795 P.2d 845, 849 (1990) (Improper to exercise peremptory challenge on religious affiliation.); *Joseph v. State*, 636 So.2d 777 (Fla. 3d DCA 1994) (Improper to peremptorily challenge a veniremember on the basis of Jewish faith.); *North Carolina v. Eason*, 336 N.C. 730, 445 S.E.2d 917, 921 (1994) (Improper to use peremptorily challenge solely because veniremember was a Jehovah's Witness. Discrimination so strongly taints the judicial system that any proceeding in which it appears is fatally flawed.); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, 516 (1979) ("... generic group affiliations which may not permissibly form the basis for jury exclusion: sex, race, color, creed [religion] or national origin."); *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 902, 583 P.2d 748, 761 (1978) ("... peremptory challenges may not be used to exclude from a jury, solely because of a presumed 'group bias,' all or most members of identifiable group of citizens distinguished on racial, religious, ethnic or similar grounds."); *Walker v. State*, 611 So.2d 1133, 1141 (Ala.Cr.App.1992) (State may not use religious affiliation as a race neutral explanation for *Batson* objection to the exclusion of blacks.); *Riley v. State*, 496 A.2d 997, 1006 (Del.1985) (Peremptory challenges based on religious affiliation are generally impermissible.); *People v.*

*Snow*, 44 Cal.3d 216, 242 Cal.Rptr. 477, 746 P.2d 452 (1987) (Peremptory challenges may not be used to exclude from a jury citizens distinguished on racial, religious, ethnic, or similar grounds.); *People v. Fudge*, 7 Cal.4th 1075, 31 Cal.Rptr.2d 321, 332, 875 P.2d 36, 47 (1994) (may not exclude veniremembers solely on religious grounds); *and, State v. Gilmore*, 103 N.J. 508, 511 A.2d 1150, 1158 (1986) ("... defendant is entitled to trial by impartial jury without discrimination on basis of religious principles...."). *See also, Brandborg v. Lucas*, 891 F.Supp. 352, 358 (U.S.Dist.Ct.—E.D.Texas 1995) (Questions concerning religion are improper at voir dire.); *State v. Willis*, 33 Ohio Misc. 159, 293 N.E.2d 895, 896 (1972) ("[N]o person shall be denied the right to serve on a jury because of status of race, religion, sex, or age so long as they are competent."); *and, United States v. Daily*, 139 F.2d 7 (7th Cir.1943) (The parties may not inquire into religious affiliation during voir dire.).

18. I am astounded at the lack of authority advanced by the majority to support its ultimate holding. The reader will observe the majority opinion provides authority only when it is in agreement with our holding on original submission. However, when the majority departs from our original holding, the reader is left baffled as to its legal authority to do so. I cannot help but believe that such an analysis was never contemplated by the Supreme Court.

sentative of some racial, sexual or religious group but as an individual citizen participating in an important function of our government. We ignore that the individual citizen's opportunity to participate in the fair administration of justice is fundamental to our democratic system and reaffirms the promise of equality under the law. When citizens are excluded from participation in our democratic processes because of such invidious discrimination, the promise of equality dims and the integrity of our judicial system is jeopardized.

A dispassionate review reveals the analysis on original submission was correct. Accordingly, the State's motion for rehearing should be overruled. Because it is not, I dissent.